ed, that the fiscal officers had uniformly construed the law as it is now contended for. The congress passing this law meant to exclude sales at sea, to prevent the use of our vessels covertly by foreigners. The register of the Missouri was vacated on the 12th February, 1801. She was from that time subject to the disabilities of a foreign ship, till her character was revived. And that could not be done till after the 21st December, 1802, when the legal bill of sale was made. No subsequent transaction can by relation operate on the duties chargeable, though the character of the ship may be restored. If the foreign character of the vessel existed at the time of the liquidation, no ex post facto proceedings can alter the then existing circumstances. There is no distinction in the law between a sale in port, or one at sea. An immediate application for a new register is required in both cases. If it cannot be had on a sale at sea, it shows that the law meant to exclude the vessel for the time from her American character: eo instanter, that the property is changed, her character ceases, or is suspended, according as she is sold to a foreigner, or a citizen. A number of British cases were produced; and said to be analogous, though in that country they related to change of property. In this the principles apply to change of character. 3 Term R. 406; 3 Brown, Ch. 571; 5 Term R. 710; 2 East, 399, 404; 1 Bos. & P. 483; Parker, 215. There is no distinction in the laws of the United States, as they relate to a sale either to a citizen or a foreigner, in the point of time, in which the American character ceases to operate. In both cases, the cessation is at the moment of sale. The citizen may revive it, but the foreigner never can.

The law of March, 1803 [2 Stat. 209], was produced to show a legislative construction. And the custom of the fiscal offices was said to be a contemporaneous and continued interpretation. Although I may not have done justice to the arguments of the counsel on either side, I have thought it proper to recite them in a summary way, to show the conflict of opinion, on the subject. For myself I declare, that, although the interpretation given on the part of the United States, is not consistent with my ideas of what the law should have been, I do not see that I am authorised judicially to pronounce that it was not, as on the part of the United States it is contended to have been, at the time of the transaction, which is the subject of discussion. It appears to me, that the congress, enacting the law of 1792, in their zeal to exclude foreigners, did not see, or chose to think lightly of, the inconveniences to which, in such cases, as the one now before me, they subjected our own citizens. It also seems to me a case omitted, either accidentally, or with design. The legislature alone were competent to remedy the defect. And they have done this in cases occurring after their act of March, 1803. In the department in which I am placed, I am not competent to give relief; or by interpretations of supposed spirit and intention, supply omissions, or add to the provisions of the then existing law. In cases attended with such unmerited penalties, it is consolatory that the laws of our country have not left the parties without protection. The congress of 1803, sensible of the hardships consequent on a rigid construction of the former law, have specially and clearly authorised the secretary of the treasury to remit "any foreign duties, which shall have been incurred," by reason of disabilities, happening under the former laws, recited in the act of March, 1803. There is no doubt in my mind, that this (the foreign duties having been incurred under the former laws, by a temporary disability and incapacity to obtain a new register) is a case proper for the deliberation of the officer vested with the power of mitigating or dispensing with the severity of fiscal laws. He may (if he so inclines under the circumstances stated to him) give the relief, which the austerity of judiciary duty disables a court from affording. Although this is my view of the subject I think it a hard case, and that it ought not to rest on my opinion. I shall deem myself bound to give every facility to an appeal. If other cases, depending on the same point, occur, I shall, on payment of the undisputed part of the demand, suspend judgment (or grant it on terms) for the contested sums, until the opinion of a superior court can be had; if the parties affected shall choose to take that course. Let judgment be entered for the sum now due to the United States. I understand that the domestic duties in part of the bond have been paid.

[On appeal to the circuit court the above judgment was reversed. Case No. 17,764. The judgment of the circuit court was affirmed by the supreme court in 4 Cranch (8 U. S.) 48.]

UNITED STATES (WILLING v.). See Case No. 17,764.

## Case No. 16,728.

### UNITED STATES v. WILLIS.

[1 Cranch, C. C. 511.] [1]

Circuit Court, District of Columbia. Nov. Term, 1808.

GAMING—COMMON-LAW AND STATUTORY OFFENCES.

Playing at any game, even for money, is not of itself an offence at common law. The offence is created by statute, and can only be punished as the statute directs.

[Cited in U. S. v. Rounsavel. Case No. 16,-199; U. S. v. Helriggle, Id. 15,344.]

Mr. Taylor, for defendant, moved to quash the indictment, which was at common law, for assembling to the number of ten or more, and playing at "snap and rattle." or "in and out," to the corruption of the public morals, and to the common nuisance of all the good citizens of the county of Alexandria. Private vices are not indictable. 4 Bl. Comm. 41.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

To play at any game is no crime at common law, even to play for money; therefore there can be no offence unless it be attended with such circumstances as would in themselves amount to a riot, or a nuisance, or to actual breach of the peace without the playing. 4 Bl. Comm. 171. All the penalties under the English law are statutory. If it were unlawful to play for money, no recovery for money won could be had at common law, yet such actions may be sustained, and the defendant even holden to bail. 2 Bac. Abr. 619, "Gaming," A; 11 Coke, 87b. And the statutes of England only prohibited playing to a certain amount. The act of Virginia of the 8th of December, 1792. § 5, p. 175, which creates the offence, declares how it shall be punished, viz. by fine of 20 dollars upon conviction before a justice of the peace.

Mr. Jones, for United States, admitted that he had no precedent for the indictment in all its parts, but contended that it is good as an indictment as a nuisance. It is sufficient to charge it to be to the nuisance of the citizens of the county of Alexandria. It is not necessary that it should be charged as a nuisance to all the citizens of the United States. He admitted that gaming is not per se indictable at common law. The Virginia law shows that gaming ·is a pernicious vice and a public evil. Every kind of public gaming is therefore unlawful; every unlawful act is not an indictable offence, but every unlawful act done in a public manner and tending to corrupt the general morals of the community is a misdemeanor at common law. He admitted that private vices are not punishable at common law. But public lewdness, bawdy-houses, eaves-droppers, communis rixatrix, and the like, are indictable misdemeanors. Gaming in England is lawful. yet the keeping of a common gaming-house is indictable at common law, because it is injurious to society. The statute of Virginia punishes all gaming at a public place, but does not describe particularly the offence charged in this indictment. The punishment ought to be proportioned to the offence. but the statute punishes all alike by a fine of 20 dollars. If the statute declares a punishment of a common-law offence. and contains no negative words. you may still indict and punish at common law. It has been so decided in this court.

THE COURT stopped the counsel on the other side who were about to reply, being of opinion that the indictment is not good at common law. The statute has created the offence and the punishment.

FITZHUGH, Circuit Judge, contra.

## Case No. 16,729.

UNITED STATES v. WILSON.

[Cited in U. S. v. Sprague, 48 Fed. 828. Nowhere reported; opinion not on file in clerk's office, with case.]

## Case No. 16,730.

UNITED STATES v. WILSON et al.

[Baldw. 78.] 1

Circuit Court, E. D. Pennsylvania. April Term, 1830.

CRIMINAL LAW—JOINT INDICTMENT — SEPARATE TRIALS—CHALLENGE OF JURORS—COMPETENCY OF WITNESSES — ADMISSIONS — ACCOMPLICES — ROBBERY — FORMER JEOPARDY — DANGEROUS WEAPONS—MAIL CARRIERS—PROVINCE OF JURY —INDICTMENT.

1. On a joint indictment it is not a matter of right to have the defendants tried separately, but it is discretionary with the court.

   [Cited in Hawkins v. State. 9 Ala. 137; Jackson v. State, 104 Ala. 3. 16 South. 524; Maton v. People. 15 Ill. 539. Cited in brief in Com. v. James, 99 Mass. 439. Cited in State v. Doolittle, 58 N. H. 92.]

2. The United States may challenge a juror in the first instance peremptorily, till the panel is exhausted. after which they can only challenge for cause.

   [Cited in U. S. v. Douglass, Case No. 14,989.]

3. It is a good cause of challenge that the juror has conscientious scruples about finding a verdict which may lead to capital punishment.

   [Cited in Gates v. People. 14 Ill. 435; Gross v. State. 2 Ind. 330; State v. Greer, 22 W. Va. 809.]

4. If a juror is wrongly named on the panel he cannot be sworn.

5. Where there are separate trials on a joint indictment, it is no cause of challenge that a juror was sworn on the first trial and found a verdict of guilty, though it is good cause to submit his indifference to triers.

6. On a challenge for favour, without cause assigned, it will not be submitted to triers.

7. It is good cause for challenge if a juror does not stand indifferent on account of bias, prejudice, having made up his mind, or expressed an opinion touching the prisoner's guilt or innocence.

   [Cited in Logan v. U. S., 144 U. S. 298, 12 Sup. Ct. 628.]

   [Cited in Com. v. Dorsey, 103 Mass. 415.]

8. It is no objection to the competency of a witness, that a reward has been offered to be paid on conviction of the prisoner, to which witness may be entitled.

9. The admissions of a prisoner, though they are not in writing or given in his words. are admissible; but the whole of a connected conversation on the subject must be given.

10. A pardon granted by a governor of a state, under its great seal. is evidence, per se, without any further proof.

11. The evidence of an accomplice cannot be corroborated by his statements at another time, unless it has been impeached.

   [Cited in brief in U. S. v. Neverson, 1 Mackey, 160.]

12. The acts of a co-defendant are ·evidence to show the connection between him and the prisoner in the same offence.

13. After a witness has been once examined, it is in the discretion of the court to permit him to be examined again on new matter, but not a matter of right.

14. The word "rob" in the act of congress of 1825, § 22 [4 Stat. 121], is used in its common law sense.

   [Cited in U. S. v. Coppersmith, 4 Fed. 200.]

1 [Reported by Hon. Henry Baldwin, Circuit Justice.]