[Civ. No. 13189. Second Dist., Div. One. Nov. 28, 1941.]

MONTEREY CLUB (a Corporation) et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

132

Samuel L. Rummel for Petitioners.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, Ned Marr, Deputy County Counsel, John F. Dockweiler, District Attorney, and Thomas O'Brien, Deputy District Attorney, for Respondents.

WHITE, J.—This is a petition for a writ of prohibition seeking to prevent the Superior Court of the County of Los Angeles from enforcing the provisions of a temporary injunction *pendente lite* issued after hearing on an order to

show cause by said court in a certain action numbered 460977, instituted by the District Attorney of Los Angeles County on behalf of the people of the State of California against E. J. Prim, Frank Martin, Myron Porter and others as defendants, and which action sought a permanent injunction restraining the defendants, their agents, or anyone acting on their behalf from conducting, maintaining or operating certain alleged gambling games on premises occupied by petitioners in the city of Gardena, in Los Angeles County. The matter is submitted to this court upon the petition and the answer thereto filed by the respondents in response to the alternative writ heretofore issued.

The essential facts of the case are as follows:

Monterey Club, one of the petitioners herein (hereinafter referred to as the club), is a corporation organized and existing under and pursuant to the laws of this state (Civ. Code, Div. 1, Pt. 4, Title 12, art. 1). Such petitioner is a nonprofit corporation and its primary purposes, as outlined in its articles of incorporation, are as follows: ''To promote, advance and maintain good will and harmonious action among the individual members; to establish higher standards of social relationship between the individual members and the public at large, to the end that the members may receive the benefits and advantages of social relationships and social intercourse, and that the public in general be benefited thereby. To establish a place or places of meeting so that the members may derive the maximum amount of pleasures and recreation.'' The membership of said club totals some 400, each and all of whom were admitted and elected to such membership pursuant to the articles of incorporation and the by-laws of the club. As a prerequisite to membership in the club an applicant therefor is required to make a written application, whereupon an investigation of such applicant's reputation, character and habits is made to determine his fitness and eligibility for membership. If such inquiry results favorably to the applicant he may be elected as a member in accordance with the by-laws, rules and regulations of the club as promulgated by its board of directors. A courtesy or guest card may be issued to a non-member, entitling the latter to the privileges of the club for a period not to exceed two weeks. Use of the club and its facilities is limited to the members and guests, and the public is not invited or permitted to enter such club or participate in its activities.

At all times herein mentioned there was and is in effect in the city of Gardena an ordinance, numbered 95, regularly and duly adopted by the council of said city and approved by the mayor, which ordinance is amendatory of ordinance number 86 and which provides in general for the licensing and regulating of certain kinds of business, trades, vocations, enterprises or occupations conducted or carried on within the limits of said city. So far as here pertinent, the provisions of said ordinance might be epitomized as prohibiting any person from conducting or carrying on the business of maintaining a place where tables are used by the public for playing cards and for the use of which tables a fee or compensation is charged the players until such person shall have first obtained a permit and license for each table he uses or proposes to use in said business. The ordinance then provides that an applicant for such a permit shall first make out an application to secure a permit from the chief of police and provides for a license fee depending upon the number of tables installed. It is further provided in said ordinance that before a permit is issued thereunder by said chief of police he shall make a full and complete investigation of the location and building where the applicant proposes to conduct such place of business. The ordinance also prescribes the construction of any building in which such business is to be carried on. By way of regulation in connection with a licensee who permits the playing of the game of ''draw poker,'' the ordinance declares that ''the playing of games not prohibited by statute is conducive to public morals, and that in any proceeding to annul license or to abate the business conducted thereunder, or to prosecute the licensee or his employees for any acts authorized thereby, it shall be presumed that such acts are not unlawful and that such business is not a public or private nuisance.'' The ordinance further provides that when an applicant for a permit or license desires to carry on the business of maintaining a place where tables are used by the public for playing the game of ''draw poker'' pursuant to the provisions of the ordinance, the application must specifically so state. The ordinance then declares it unlawful for any permittee or licensee to permit any person under the age of 21 years to play the game of draw poker at any time on the premises referred to in such permit or license and limits the hours

within which such business may be conducted. Finally, the ordinance declares the violation of the same to be a misdemeanor and provides a penalty therefor.

The ordinance provides that the terms thereof shall not apply to regularly incorporated social clubs or fraternal organizations not open to the general public and whose membership is restricted to those persons regularly and formally elected to membership therein, nor to any charitable or benevolent organization which may from time to time hold card parties, the proceeds from which are used for charitable or . benevolent purposes.

Concededly, the petitioner Frank Martin is the holder of an unrevoked license issued to him pursuant to the terms of the foregoing ordinance, authorizing him to operate card tables in conformity with such ordinance upon the premises occupied by the petitioner Monterey Club within the city of Gardena, and of which premises the said Martin is lessee.

It further appears that when by resolution of the board of directors of the club it was voted to domicile said club and hold the meetings thereof in the premises of which petitioner Martin was the lessee, and in connection with which premises he held a license from the city of Gardena to operate tables for the playing of draw poker, said club entered into a contract in writing with petitioner Martin, under the terms of which the latter undertook and agreed to provide and maintain suitable furniture, fixtures and equipment for the use of said club and its members and also to maintain said premises as a suitable meeting place for the members of the club and to provide facilities for such members to engage in lawful games of cards, checkers, dominoes and other recreational activities; to equip and maintain suitable facilities for the serving of non-alcoholic beverages, sandwiches and other foods to the members of the club. Said contract further provided that Mr. Martin would refuse permission to any person other than a *bona fide* member or guest of said club to enter upon the premises for the purpose of using the facilities therein located. Under the terms of the contract petitioner Martin was also invested with the right to make a reasonable charge for furnishing such facilities, service and food to the members of said club or their guests; and he agreed to provide and furnish necessary employees, and would have the right to refuse use of the premises to any individual member

of the club or any guest violating any of the rules of conduct promulgated by the board of directors or who should engage in any loud, obnoxious or boisterous actions.

It is further made to appear that petitioner Martin, pursuant to the terms of his contract, equipped and furnished the premises in question at a substantial cost; that he is the owner of such equipment and has carried out all the provisions of the said contract upon his part agreed to. As a part of such facilities, it appears that petitioner Martin has, in accordance with the permission granted him by the license from the city of Gardena, furnished and operated tables upon which members and guests of the club were permitted to play draw poker, "low ball," and also games commonly known and referred to as contract bridge and rummy.

In connection with the operation of said tables, the pleadings indicate that in the playing of low ball, "before each hand each player antes five cents, and that the cards were dealt out one at a time until each player had five. The player to the left of the dealer had the privilege of opening first, and fifty cents was the minimum and maximum bet, with as many raises and re-raises as the players desired to make. Those who met the opening bet then drew the number of cards they wanted; then it was up to the players whether to check or bet, and the lowest valued hand won the pot." That in playing the game of draw poker the cards were dealt out as aforesaid; "that the player on the left of the dealer had the privilege of opening the pot; that the deal passed to the player immediately to the left of the dealer after each hand," there being no "banker" who conducted the game or obtained a percentage therefrom. "That each player anted five cents before the deal; that the pot could be opened with jacks or better, with a minimum and maximum bet of twenty-five cents and fifty cents respectively, with no limit on the number of raises and re-raises. That the best high poker hand won the game."

It further appears that in connection with the playing of the game of low ball poker, each half hour one of the attendants upon the premises came to the table and collected a twenty-five-cent chip from each player; that this was for rent of the chair and table. From the players engaged in the game of draw poker the attendant collected two five-cent chips as rental for the chair and table from each player.

While no money was used in the conduct of the games, the record shows that the players purchased poker chips for cash at a cashier's cage on the premises in question, which chips were in denominations of five, ten and twenty-five cents. These chips were redeemable in lawful money of the United States at the cashier's window. Any player was privileged at any time he so desired to leave the game and redeem his chips for cash.

The complaint filed by the District Attorney of Los Angeles County in behalf of the people of this state alleged that the defendants therein named, including petitioner herein Frank Martin, for a period of at least ten days prior thereto and with the knowledge and consent of the owner of the premises, were using such premises and the furniture and fixtures therein contained for the purpose of "carrying on and conducting as the owners and operators thereof said gambling games on said premises under the fictitious name and style of Monterey Club. That in conducting, operating and maintaining said gambling games, said defendants, and each of them, have caused said premises, buildings, furniture, fixtures and other equipment hereinabove described to be used in the way and manner and for the purpose of inducing, inviting and encouraging the public generally to enter into said premises, and to then and there engage in and play at said gambling games. . . . " Then follows a description of the manner in which said games were played as hereinabove set forth. The complaint further charged: "That the maintenance, existence, operation and conduct of said gambling games by the owners and operators thereof has in the past constituted, and does now and will in the future constitute the keeping of a gaming and gambling house and public nuisance injurious to the health of the people of the State of California, for the reason that it tends to and does in fact debase and corrupt the public morals, encourages idle and dissolute habits, draws together great numbers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, and is thereby injurious to health, indecent and offensive to the senses, and impairs the free enjoyment of life."

The prayer contained in said complaint was for a permanent injunction restraining the defendants from conducting, maintaining or operating the gambling games in question

upon the premises mentioned, and further, that the judgment in said action determine and declare that the maintenance and operation of said gambling games and each of them on the premises referred to constitutes and is a public nuisance and that the owners of the premises upon which said games were being conducted be enjoined and restrained from renting, leasing, or permitting the premises to be used for the aforesaid purposes.

Upon the filing of said complaint an order to show cause and temporary restraining order were issued. On the return day fixed in the order to show cause defendants named in said action appeared and presented affidavits in opposition to the requested preliminary injunction. These affidavits included one by Myron H. Porter, president of the Monterey Club, in which he set forth the status of such club as a nonprofit corporation, detailed the terms of the aforesaid agreement between the club and petitioner herein, Frank Martin, and also averred that no persons were permitted to enter upon or in said premises except duly elected and qualified members of the club or *bona fide* guests. He denied that the games played in and upon the premises were unlawful or that any of the activities conducted upon said premises, including the playing of draw poker or low ball poker, were harmful to the public or against public health, safety, peace or interest in any manner or way, or indecent or offensive to the senses of the community or neighborhood. This affiant further denied that the activities of the club in the playing of games therein attracted a great number or any number of dissolute persons, but on the contrary stated that no disorderly persons were permitted to come or ever did come upon the premises; that no persons of idle or dissolute habits or of debased or corrupt character were permitted upon the premises. Corroborative of the statements contained in the affidavit of the president of the Monterey Club was the affidavit of petitioner Frank Martin. It further appears from the last-named affidavit, and is denied by respondents *only* upon the ground of lack of information or belief, that the maintenance, operation and conduct of places of business where draw poker and other similar games are played is permitted throughout the State of California, and the names of various cities in this state, totaling seventy-six, together with the number of similar enterprises operated in

each of the respective cities, is set forth in the affidavit. Further corroboration of the foregoing affidavits was furnished by the affidavits of Russell Miller and Franklin Cogswell, members of the Monterey Club. There was also presented to the superior court at such hearing the affidavit of Don Parrott, chief of the fire department of the city of Gardena, who deposed and said that he was familiar with the premises occupied by the Monterey Club and the nature and character of the activities conducted therein, and had visited such club on several occasions. He further averred that the building in which said club was conducted was attractive and sanitary in all respects and particulars, was adequately illuminated and heated, and that he had never observed therein any disorderly conduct or breach or disturbance of the public peace, and that at all times the club had been conducted in an orderly manner and the members thereof appeared to him to be law-abiding citizens. On the occasions of his visits affiant stated that he had never observed any lewd, dissolute or immoral persons or any conduct inimical to the peace and contentment of the community. This affiant gave it as his opinion that said club is and at all times since its establishment has been ''a credit to the community.'' Also introduced at the hearing on the order to show cause was the affidavit of Elmo Field, chief of police of the city of Gardena. This affiant stated that he is familiar with the Monterey Club, has visited the same on many occasions since it opened, and that at all times it had been conducted solely as a private social club where members may play various card games, including draw poker, high or low hand, and may obtain light lunches, soft drinks and tobacco. The chief of police further stated that he knows the rules and methods pertaining to the game commonly known as draw poker; that he has observed the nature of the game played by the members and that it is draw poker; and that he has never seen any game other than draw poker, high or low hand, played therein. He then detailed the procedure of collecting from the users of the tables a rental therefor. We quote from his affidavit the following: ''That there is and has been no traffic congestion in front of or in the vicinity of said Monterey Club since it was established. Adequate parking facilities have always been provided and made available; affiant has never known or heard of a traffic accident

in front of said premises, nor has any complaint been made to affiant concerning the actions of the proprietor of the premises, the conduct of the club or the conduct of the members thereof. That at all times herein mentioned, to the knowledge of affiant, the premises have been operated in respect to the playing of cards in the card room of said club in strict compliance with the license therefor issued by the City of Gardena.''

The mayor of the city of Gardena by his affidavit stated that he had visited the Monterey Club and that the same was conducted in an orderly and peaceful manner; that the members were law-abiding citizens; that he had never observed any immoral or dissolute practices, and that, as stated by him, ''there is and was nothing about the said club or the manner in which it was conducted, or the conduct of the employees or members thereof, which was in any way whatsoever offensive to public morals or decency, nor of such a character as to interfere with the peace and contentment of the community nor was the same a nuisance of any kind or character. On the contrary, in the opinion of this affiant, said Monterey Club is and at all times since its establishment has been a credit to the community.''

The affidavit of the mayor was corroborated by those of Earl Jacobs and Earl P. Powers, members of the council of the city of Gardena. That the Monterey Club was maintained as a private club catering only to its members; that the city of Gardena has a population of approximately 6,000 persons; that he never observed any one engaged in any disorderly conduct nor had he ever seen or heard of any breach of the public peace by anyone; that he had never witnessed any offensive conduct within or about said club, was the statement contained in the affidavit of P. MacDonneil, secretary of the Gardena Valley Chamber of Commerce, secretary of the Harbor District Chamber of Commerce, and president of the Lions Club of Gardena. Lewis T. Guild, Jr., editor and publisher of the Gardena Valley News, made affidavit to the same effect, and he too averred that the club ''at all times since its establishment has been a credit to the community.''

In opposition to the foregoing affidavits and in support of the order to show cause, there were presented the affidavits of two deputy sheriffs of the county of Los Angeles, who

deposed that they obtained admission to the club by filling out an application card and paying twenty-five cents as dues. They then described the interior of the building occupied by the club as hereinbefore set out. They further averred in their affidavits that they purchased chips and engaged in playing draw and low ball poker in the manner and form hereinabove narrated.

There is also on file the answer of the defendants in the action instituted by the district attorney, in which pleading the alleged illegality of the games played in the Monterey Club is denied; and which pleading denies that the public generally is invited or permitted to engage in such games upon the premises of said club and alleges that on the contrary the use of said club and its facilities is limited to duly elected members and *bona fide* guests. The answer further denies that the operation of said club is a public nuisance, injurious to the health of the people, or that any idle, dissolute persons are or ever have been permitted within said club. As a further, separate and affirmative defense, the answer alleges facts in connection with the operation of the club which are heretofore in this opinion set forth, and which facts, generally speaking, were presented upon the hearing of the order to show cause by affidavits, from which quotations hereinbefore have been made.

■ Respondents first urge that petitioners here are not entitled to the writ sought on the ground that the court was vested with authority to hear and determine the cause; that such authority constitutes jurisdiction, and jurisdiction carries with it the power to decide wrongly as well as the power to decide rightly. Respondents' claim in this regard cannot be upheld. In the recent case of *Fortenbury* v. *Superior Court,* 16 Cal. (2d) 405 [106 Pac. (2d) 411], at page 407, it was pointed out that the original conception of the meaning of the term "jurisdiction" as including only the right to hear and determine concerning the subject matter of the case has been broadened where the right to review a decision or order by prohibition or other prerogative writ is the question for decision. In the cited case it was said: "A court may have jurisdiction of the cause of action and of the parties, but it may lack the authority or power to act in the case except in a particular way. Under such circumstances, it is now generally held that the court had no

jurisdiction. . . . '' If, therefore, in the instant case the court was without authority or power, as claimed by petitioners, to enjoin them as it did, then relief may be sought by resort to a writ of prohibition.

█ It is next urged by respondents that petitioner Monterey Club is not entitled to a writ of prohibition because the club was not named in nor a party to the injunction proceeding pending before respondent court. This contention is equally without merit, because section 1103 of the Code of Civil Procedure authorizes the issuance of the writ upon the verified petition of ''the person beneficially interested.'' We hold that the claimed legal rights of Monterey Club being injuriously affected by the judicial action of respondent court, the club is ''beneficially interested'' and therefore authorized to apply for a writ of prohibition.

█ While it is true, as claimed by respondent, that ordinarily as a condition precedent to an application for a writ of prohibition on the ground of want of jurisdiction in the inferior tribunal to make the order, the claim of such excess or lack of jurisdiction should be called to the attention of the respondent tribunal unless the complaint on its face reveals its failure to state a cause of action, nevertheless this is not essential to the jurisdiction of this court to grant a writ of prohibition. (*Havemeyer* v. *Superior Court,* 84 Cal. 327, 405 [24 Pac. 121, 18 Am. St. Rep. 192, 10 L. R. A. 627].) This is merely a rule adopted by reviewing tribunals as a matter of respect for and consideration of the lower court and to aid in minimizing, if not preventing, unnecessary litigation. The rule, however, is not invoked where it appears that the plea would have been rejected if presented in the lower court or where, as here, it is apparent that the proceedings on the order to show cause in their entirety went to the question of the jurisdiction of the lower court to enjoin what petitioners here contended in the court below was a legal and lawful enterprise and business. Furthermore, petitioner Monterey Club was not a party to the proceedings in respondent court and therefore had no opportunity to there object on jurisdictional grounds before the action of such court which is here sought to be restrained by prohibition was taken.

█ While it may be conceded, as urged by petitioners, that where, as here, an answer has been filed specifically

denying all the material allegations of the complaint, the general rule is that a temporary injunction will not be granted, nevertheless, circumstances may exist in a case which justify the issuance of a temporary injunction notwithstanding the absolute denials in the answer. Assuming that the court in the instant proceeding had jurisdiction to grant the temporary injunction prayed for, then the granting or refusal of it was a matter addressed to the sound discretion of the trial court and the action taken by such court will not be disturbed except where an abuse of discretion is shown. The rights of the people to be protected and immunized from a nuisance affecting the public well-being where such nuisance exists, are such that in granting a temporary injunction upon sufficient allegations contained in a verified complaint, it could not be said in all cases to constitute an abuse of discretion. (*Metropolitan L. Co., Ltd.*, v. *Greenfield,* 20 Cal. App. (2d) 246, 247 [66 Pac. (2d) 722].)

But it is futile to quibble over technical objections when the sole question presented to the trial court and now directed to us was and is whether the playing of draw poker under the circumstances prevailing at the Monterey Club was a nuisance and subject to be abated and enjoined. It is not necessary for us to resort to the common law for a definition of what constitutes a nuisance, because, as was held in an especially well-considered opinion prepared by Mr. Chief Justice Gibson of the Supreme Court in the case of *People* v. *Lim,* 18 Cal. (2d) 872 [118 Pac. (2d) 472], an action such as this to enjoin the operation of an alleged gambling house must be predicated upon the statutes of this state rather than upon the common-law definition of ''public nuisance.'' In the cited case it is pointed out that while a line of cases therein referred to seemingly indicates that at common law gambling houses were recognized as public nuisances in criminal prosecutions, nevertheless such cases do not serve as authority for holding that an equity action could be instituted on behalf of the state at common law to enjoin the operation of a gambling house. The attitude of the earlier courts of equity where the sovereign sought injunctions against public nuisances is epitomized by our Supreme Court in the cited case by the following quotation from the opinion of Chancellor Kent in a leading case: ''I know that the Court

is in the practice of restraining private nuisances to property, and of quieting persons in the enjoyment of private right; but it is an extremely rare case, and may be considered, if it ever happened, as an anomaly, for a Court of equity to interfere at all, and much.less preliminarily, by injunction, to put down a *public* nuisance which did not violate the rights of property, but only contravened the general policy." (*Attorney-General* v. *Utica Insurance Co.,* 2 Johns. Ch. (N. Y.) 371, 380.)

Section 3479 of the Civil Code defines a nuisance, so far as here applicable, as "anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. . . . " ▮ In California the common law is inapplicable where, among other things, it has been modified by our statutes. (*Estate of Elizalde,* 182 Cal. 427, 432, 433 [188 Pac. 560].) The Constitution of the United States, guaranteeing as it does individual rights to life, liberty and the pursuit of happiness, was ordained it is true by descendants of Englishmen who inherited the traditions of English law and history; but our Constitution was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations, of many tongues, and while we take pride in the principles and institutions of the common law, we are not to forget that in lands, including our own, where other systems of jurisprudence prevail, the idea and processes of civil justice are also not unknown. In recognition of the foregoing, we find it ordained by section 4468 of our Political Code that "the common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States or the Constitution *or laws of this state,* is the rule of decision in all the courts of this state"; and again, section 4 of the Civil Code provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice."

▮ Sections 3480 and 3481 of the Civil Code define a public and a private nuisance. Section 3482 of the same code

declares: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."

The lack of authority of the courts to resort to equity for the purpose of justifying action of the character taken by the court in the instant case is clearly established in *People* v. *Lim, supra,* where it is emphatically stated that " . . . the equitable remedy has the collateral effect of depriving a defendant of the jury trial to which he would be entitled in a criminal prosecution for violating exactly the same standards of public policy. . . . The defendant also loses the protection of the higher burden of proof required in criminal prosecutions and, after imprisonment and fine for violation of the equity injunction, may be subjected under the criminal law to similar punishment for the same acts. For these reasons equity is loath to interfere where the standards of public policy can be enforced by resort to the criminal law, and in the absence of a legislative declaration to that effect, the courts should not broaden the field in which injunctions against criminal activity will be granted. Thus, for the reasons set forth, the basis for an action such as this must be found in our statutes rather than by reference to the common law definitions of public nuisance."

 It might be added here by way of emphasis that even if the playing of draw poker were a crime, which under the statutes of California it is not, still a court of equity would be without jurisdiction to enjoin the commission of such an act merely because when committed it would constitute a crime. A court of equity will not undertake to enforce the criminal law. (*Weis* v. *Superior Court,* 30 Cal. App. 730 [159 Pac. 464] ; *People* v. *Seccombe,* 103 Cal. App. 306, 312, 313 [284 Pac. 725].) And the reason for such a rule under our form of government is clear, because as pointed out by the Supreme Court in the Lim case, *supra,* an individual accused of crime by way of prohibition or injunction would not only be required to prove his own innocence, but as well would be deprived of the right of trial by jury, the protection of the presumption of innocence and the doctrine of reasonable doubt; and in the final analysis, upon an order to show cause would be forced to become a witness against himself.

 As set forth in the case of *People* v. *Lim, supra,* the courts have therefore refused to grant injunctions on behalf

of the state except where the objectionable activity can be brought within the terms of the statutory definition of public nuisance. In the cited case the court says: ''Where the legislature has felt that the summary power of equity was required to control activity contrary to public policy, it has enacted statutes specifying that such activity constitutes a public nuisance which may be enjoined in an action brought on behalf of the state. . . . ' . . . but it is not the province of the courts to ordain such jurisdiction for themselves.' ''

■ Any ordinance passed by a municipal corporation within the scope of the authority conferred on it has the same force within its corporate limits as a statute passed by the legislature has throughout the state. (*Marculescu* v. *City Planning Com.*, 7 Cal. App. (2d) 371 [46 Pac. (2d) 308].) Section 862.12 of the Municipal Corporations Act (Stats. 1935, p. 2071) expressly authorizes municipalities ''to license for the purpose of revenue and regulation all and every kind of business authorized by law . . . and lawful games carried on therein. . . . '' That by reason of the aforesaid delegation of power the city of Gardena was authorized to pass the ordinance hereinbefore referred to licensing the playing of draw poker, if such game was not unlawful, admits of no argument or denial. Manifestly, under the terms of section 3482 of the Civil Code, *supra,* nothing done under the express authority of a statute or within a city by authority of an ordinance can be deemed a nuisance. Nowhere in the codes of this state is the playing of draw poker or the maintaining of a place where it is played denounced as a crime or declared to be unlawful. Whatever games may have been outlawed by the common law, the statutes of this state have undertaken to enumerate and define those games the playing of which is unlawful, and draw poker is not one of them. (Pen. Code, sec. 330.) Also noteworthy in this connection is the fact that section 331 of the Penal Code makes it unlawful to permit the playing in any house only the games mentioned in the preceding section. The difference between places where games inhibited by the code are played and those where poker is played is thus described by Chief Justice Beatty in *Ex parte Meyer,* 5 Cal. Unrep. 64 [40 Pac. 953] : ''The difference between the two places is just exactly as broad as the difference between legality and illegality, or in other words, since we have none but statutory crimes, it is as broad as the

difference between guilt and innocence.'' In the same opinion follows this expressive language: ''Poker, played for money, however objectionable in fact, is, in the eyes of the law, as innocent as chess or any game played for simple recreation; and its votaries, and the places where it is played, are not criminal.''

Neither playing draw poker nor maintaining a place where it is played being an offense under our law, and therefore being lawful, it follows that the city of Gardena was authorized to license and regulate the operations of such pastime within its corporate limits, and no action can be maintained in law or equity against one operating a business authorized by statute or ordinance upon the claim that such enterprise or business is a public nuisance. (Civ. Code, sec. 3482.) Nor, from the fact that gambling is associated with the games herein described, does it necessarily follow as a matter of fact or as a matter of law that a public nuisance is thereby born of such pastime. Gambling is neither unlawful *per se* nor a public nuisance *per se* in California. In the face of the declaration of the legislative branch of the government, to which branch alone is confided the duty of determining the policy of this state in the matter of public morals, it does not lie within the power of the courts to impose their views as to what is moral or immoral, or what is beneficial or deleterious to public welfare, upon the residents of a community who have legalized the playing of a game not outlawed by statute. In a field where the meaning of such terms as ''public nuisance'' is so vague and uncertain, it ''is a proper function of the legislature to define those breaches of public policy which are to be considered public nuisances within the control of equity. Activity which in one period constitutes a public nuisance, such as the sale of liquor or the holding of prize fights, might not be objectionable in another. Such declarations of policy should be left for the legislature. . . . '' (*People* v. *Lim, supra.*)

Playing at any game, even for money, is not of itself an offense at common law. The offense, if any, must be created by statute, and can only be punished as the statute directs. (*United States* v. *Willis*, 1 Cranch, C. C. 511 [28 Fed. Cas. p. 698, No. 16,728].) The statutes of this state enumerate and define what games are inimical to public morals and welfare and should therefore be declared un-

lawful. The statutes further declare that what is not unlawful cannot be made the subject of a nuisance. Whatever may have been the rule at common law with reference to gambling, such rule has been superseded by the statutes of this state, and is therefore inapplicable.

It may be conceded that in the case of *People* v. *Lim, supra,* the Supreme Court held that a complaint containing averments similar to those pleaded in the case at bar was adequate and sufficient as against a demurrer. We refer to the allegations that the alleged gambling house "draws together great numbers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, creates traffic and fire hazards, and is thereby injurious to health, indecent and offensive to the senses, and impairs the free enjoyment of life and property." And, as also pointed out in the Lim case, the free enjoyment of life and property and the dangers designated in the nuisance statute may be impaired through the assemblage of disorderly people who disturb the peace and obstruct the traffic. However, it is important to note that in the case before us the sufficiency of the allegations contained in the complaint is not the issue we are called upon to decide. In the instant case not only was an answer filed, but a hearing was had upon the order to show cause predicated upon the averments of the complaint, at which hearing, as heretofore pointed out, many affidavits were filed. At that hearing not one iota of evidence was presented which would bring the conduct of petitioner Martin, the club, or its activities, within the pale of our California nuisance statute (Civ. Code, secs. 3479, 3480); but on the contrary, it was established without contradiction that none of the hazards designated in the statute were present in the operation or conduct of the Monterey Club.

As above noted, the complaint filed by the district attorney was an injunction action seeking to abate a public nuisance. The respondents' answer in the within proceedings contains the following allegation: "Respondents allege that the purpose and object of the complaint in injunction is to abate a common nuisance consisting of a common gaming and gambling house by enjoining gambling in connection with the games of draw poker and low ball poker as described in said complaint." The utter failure of proof on this issue,

as the record clearly reveals, serves to emphasize the significance of that portion of the opinion in the Lim case, *supra,* which merely holds the complaint to have been sufficient as against a demurrer.

From the foregoing it follows that the temporary injunction granted by respondent court against petitioners was beyond and in excess of the jurisdiction of such court. Let a peremptory writ issue as prayed.

York, P. J., and Doran, J., concurred.