649 F.2d 1315
 The PACIFIC TELEPHONE AND TELEGRAPH COMPANY, a corporation,
Plaintiff-Appellee,
v.
MCI TELECOMMUNICATIONS CORPORATION, a corporation,
Defendant-Appellant.
MCI TELECOMMUNICATIONS CORPORATION, a corporation, Third
Party Plaintiff-Appellant,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, a corporation,
Third Party Defendant-Appellee.
 No. 80-5058.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 8, 1981.
Decided June 17, 1981.
As Corrected June 19, 1981.
 
 C. Stephen Howard, Tuttle & Taylor, Inc., Los Angeles, Cal., for defendant-appellant.
 Frank Rothman, Wyman, Bautzer, Rothman & Kuchel, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before TUTTLE*, ALARCON, and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Pacific Telephone and Telegraph Company (PT&T) filed this action against MCI Telecommunications Corporation (MCI) in state court in California, seeking the balance due on a contract for communications services. MCI removed the action,[1] and subsequently filed a third-party complaint against American Telephone and Telegraph Company (AT&T), seeking indemnification. The district court granted summary judgment to PT&T and dismissed the third-party complaint. We vacate the order granting summary judgment, affirm the dismissal of the third party complaint, and remand the case to the district court.
 
 Background
 
 2
 In the early part of 1975, MCI contracted with General Motors Corporation for communications facilities to connect GMC's San Francisco Bay area offices with GMC facilities in Detroit and Chicago. The contract provided that service was to commence on July 1, 1975. In order to fulfill its obligations under the contract, it was necessary that MCI arrange a communications link between GMC's Oakland offices and MCI's microwave relay facilities in Los Angeles or Phoenix.
 
 
 3
 MCI attempted to secure the necessary facilities from AT&T in April of 1975 by submitting requests under two different tariffs. The cost under one tariff would have been $32,000 per month, and under the other, $52,000 per month. Both requests were denied.[2] MCI then ordered identical facilities from PT& T under a third tariff, for which the billing rate was approximately $181,000 per month. Although MCI received the service it ordered from PT&T, it made monthly payments of only $32,000, the cost of service (under Tariff 260) previously refused by AT&T. By letter of March 22, 1976, PT&T notified MCI that the facilities were subject to disconnection on April 22, 1976, for non-payment of past due bills.
 
 
 4
 On April 20, MCI filed a petition for emergency relief with the Federal Communications Commission, asking that the Commission order PT&T not to terminate service. MCI argued that AT&T's unlawful action in denying MCI service under Tariffs 260 and 266 relieved MCI of its obligation to PT&T. The F.C.C. released its Memorandum Opinion and Order on July 30. MCI Telecommunications Corp., 62 F.C.C.2d 703 (1976). The Commission denied the emergency relief, and commented that MCI was "legally obligated to pay PT&T" regardless of any alleged unlawful action on AT&T's part. 62 F.C.C.2d at 705. It also suggested that the proper route to obtain an adjudication of the lawfulness of AT&T's actions was to bring an action under sections 206 and 209 of the Communications Act, 47 U.S.C. sections 206-209 (1976). The F.C.C. also ordered AT&T to submit an explanation of its alleged inability to fulfill MCI's request under Tariff 266 by the date service was to commence under MCI's contract with GMC.[3]
 
 
 5
 On September 22, 1976, MCI filed a formal complaint with the Commission against AT&T and PT&T pursuant to sections 206 to 209. In its complaint, MCI argued that AT&T's denial of service under Tariff F.C.C. No. 260 was unlawful in light of the Commission's determination that the "customer premises" restriction that had led to the denial was unlawful. See American Telephone and Telegraph Co., 60 F.C.C.2d 939, 942 (1976). MCI, in other words, urged the Commission to apply its decision retroactively. MCI also contended that if the F.C.C. did not give the determination retroactive effect, it should still find the refusal unlawful, because the restriction was allegedly applied in an uneven manner. In June of 1977, while the Commission was considering MCI's complaint, PT&T filed this action in state court to collect its overdue bill, and MCI removed the case.
 
 
 6
 The F.C.C. handed down its decision in late 1979. MCI Telecommunications Corp., 74 F.C.C.2d 184, 191 (1979). As to the alleged unlawfulness of Tariff F.C.C. No. 260, the Commission considered it unnecessary to reach the issue of whether to give its American Telephone and Telegraph decision invalidating the customer premises restriction retroactive effect. The Commission instead reasoned that MCI's use of the facilities in fulfilling its obligations to GMC would have constituted a resale that was barred by a separate provision of the same AT&T tariff.[4] This restriction, however, had also been found unlawful by the F.C.C. in Resale and Shared Use of Common Services, decided just two weeks before the Commission had denied MCI's previous petition for emergency relief.[5] The issue then became, according to the Commission's reasoning, whether the Resale decision was to be given retroactive effect. The Commission concluded, apparently in light of the fact that its Resale decision was the product of notice and comment rulemaking procedures, that "it would be unfair to give Resale and Shared Use retroactive application because the findings of unlawfulness are related to a determination of new policy."[6] MCI Telecommunications Corp., 74 F.C.C.2d at 193-94. Therefore, the Commission refused to find AT&T's rejection of MCI's request under Tariff 260 unlawful. In its decision the Commission also considered AT&T's explanation of its inability to provide the service requested under Tariff 266, and found that explanation to be "sufficient." Id. at 190-91. MCI appealed the Commission's decision to the Court of Appeals for the District of Columbia Circuit.
 
 
 7
 The district court had stayed PT&T's action below while the F.C.C. was considering the matter. The F.C.C. decision was released on October 22, 1979. On November 2, PT&T filed its motion for summary judgment in this case. The district court granted the motion.[7] The court's decision briefly recited the factual background of the contract between MCI and PT&T, and concluded that MCI had breached that contract by remitting only part payment. The court also concluded, in its only mention of AT&T, that MCI had presented "no equitable grounds, and no other grounds, that would warrant invoking the alter-ego doctrine on a theory that Pacific should be held liable to MCI for any wrongs allegedly committed by American Telephone and Telegraph Company." Damages and interest were calculated to total approximately $1.1 million. MCI filed a timely notice of appeal.
 
 
 8
 While this appeal was pending, the F.C.C. made a motion in the Court of Appeals for the District of Columbia Circuit seeking to have the case remanded to the Commission for further consideration. The F.C.C. conceded that MCI's brief to that court raised "matters the Commission either did not address or addressed inadequately." The motion was granted, and the Commission subsequently vacated its earlier decision by order adopted March 26, 1981, concluding that its earlier order "was inadequate to dispose of the complaint" and directing an expedited rehearing. The order retained all three parties to the original proceeding (AT&T, PT&T and MCI), and summarized the issues to be reconsidered as the lawfulness of AT&T's refusal to accept MCI's order under Tariff 260, the reasonableness of AT&T's explanation of its inability to provide the requested service under Tariff 266, and the damages to be awarded MCI, if any, in the event of a finding of a violation of the Act.
 
 The Summary Judgment Order
 
 9
 We vacate the order granting summary judgment, because of the F.C.C.'s decision to vacate and reconsider its previous decision in MCI Telecommunications. We consider that a determination by the Commission of the issues presented in MCI's complaint against PT&T and AT&T is important to the resolution of this action.[8] As to the proceedings that may be required following remand, some preliminary observations are in order.
 
 
 10
 We do not disagree with the district court's conclusion as to the inapplicability of the alter-ego doctrine, as the court based this conclusion on the absence of equitable considerations that might justify looking past the separate corporate forms of AT&T and PT&T.[9] Nevertheless, we consider MCI's defense fairly susceptible to an alternate characterization as alleging the existence of a civil conspiracy between AT&T and PT&T. At the time the district court granted PT&T's motion for summary judgment, the F.C.C. had found that AT&T had not committed any unlawful act in denying MCI service under its two tariffs; this finding obviated any possible defense based on civil conspiracy, and the district court was therefore not required to consider that defense. However, since the F.C.C. has now vacated its findings and decided to reconsider its decision, it can no longer be said that consideration of MCI's possible civil conspiracy defense is unnecessary. To the contrary, in the event the F.C.C. were to rule in favor of MCI after reconsideration, MCI's answer in this case would raise civil conspiracy issues that the district court would be required to consider prior to again ruling on a motion for summary judgment.[10] The following analysis considers the nature of such inquiry.
 
 
 11
 We note that the California courts have held that "words such as 'conspire' and 'conspiracy' need not be used in charging a civil conspiracy." Kramer v. Ferguson, 230 Cal.App.2d 237, 247 n.1, 41 Cal.Rptr. 61 (1964). We would not consider such an approach inconsistent with the Federal Rules. As to the sufficiency of MCI's allegations as a defense of illegality, the California courts have repeatedly recognized the breadth of the basic principle that courts will not enforce contracts tainted with illegality. See, e. g., Lewis & Queen v. N. M. Ball Sons, 48 Cal.App.2d 141, 308 P.2d 713 (1957). The court in Lewis & Queen gave the following general formulation:
 
 
 12
 Whatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and the duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids. It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue.
 
 
 13
 Id. at 147-48, 308 P.2d 713 (citations omitted).
 
 
 14
 California law also provides guidance on the issue of the elements of a civil conspiracy. Unlike its criminal counterpart, a civil conspiracy in order to be actionable requires independently wrongful act and resulting damages. See Wyatt v. Union Mortgage Company, 24 Cal.3d 773, 787, 157 Cal.Rptr. 392, 598 P.2d 45 (1979). MCI contends that the refusal to provide service was the wrongful act. PT&T's participation in these decisions, if any, is a separate issue. Under California law, participation may be inferred from the circumstances, or based on tacit consent. The California supreme court in Wyatt noted that:
 
 
 15
 (T)he requisite concurrence and knowledge "may be inferred from the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator.
 
 
 16
 Id. at 785, 157 Cal.Rptr. 392, 598 P.2d 45 (citations omitted).
 
 
 17
 The district court was not required to rule on these issues at the time it granted summary judgment. As we noted above, the F.C.C. decision as it then stood eliminated any possibility of a civil conspiracy defense. In addition, oral argument on the plaintiff's motion for summary judgment reveals some confusion on the part of defense counsel as to the terms in which best to state the theory, and whether it was distinct from the alter-ego argument. Nevertheless, we consider the civil conspiracy issue sufficiently presented by MCI's answer. Even were that not the case, this court has previously had occasion to address the propriety of summary judgment when issues are inadequately presented by the pleadings or presented only by the record:
 
 
 18
 (W)here the entire record reveals facts susceptible of inferences that would justify an amendment of the pleadings and save the action, a motion for summary judgment should not be granted, but the party against whom the motion is directed should be afforded an opportunity to amend his faulty pleadings.
 
 
 19
 Castner v. First National Bank, 278 F.2d 376, 384 (9th Cir. 1960). Should there remain a question about the advisability of amendment, the court should allow MCI an opportunity to do so. The affidavit of Mr. Knowles, a former employee of AT&T now employed by MCI, sets forth facts regarding the contract here at issue and the relation between AT&T and its subsidiary operating companies; these facts are "susceptible of inferences" that justify affording MCI that opportunity.
 
 
 20
 We now consider the question of how the district court should proceed following remand. Since the unlawful act alleged by MCI is a violation of the Communications Act and relates specifically to the "reasonableness" of the refusal to provide service, and since there is already a proceeding before the F.C.C. involving these precise issues,[11] we consider this an appropriate case for application of the doctrine of primary jurisdiction. See Pennsylvania R. R. Co. v. Clark Bros. Mining Co., 238 U.S. 456, 469, 35 S.Ct. 896, 900, 59 L.Ed. 1406; see also Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970).[12] The district court conducted the proceedings below in a manner consistent with that doctrine. It stayed the proceedings until the F.C.C. had determined that AT& T's refusal to service was lawful, and immediately thereafter granted PT&T's motion for summary judgment. While the court's ruling makes no express mention of the F.C.C. ruling, the record is clear that the court deemed it advisable to await that ruling before considering PT&T's complaint. The district court advised the Commission's Common Carrier Bureau by letter dated January 1, 1979, that resolution of PT&T's action "would be facilitated" by the Commission's determination of MCI's complaint. An express reference by the court to the Commission of issues identical to those it was already considering would have been superfluous.[13]
 
 
 21
 Given the present posture of the case, it would be proper once again for the district court to stay the proceedings to await final action by the F.C.C. on MCI's complaint. See, e. g., MCI Communications Corp. v. American Telephone and Telegraph Co., 496 F.2d 214, 223-24 (2d Cir. 1974). The District of Columbia Circuit in its order of remand gave an express admonition to the Commission to "act expeditiously" and the Commission in its motion for remand indicated its intention to do so. Thus, any further stay of these proceedings in the district court will not likely result in significant delay, and will afford the district court the benefit of the guidance of the agency charged with the complex administrative task of regulating the communications industry. See Citibank v. Graphic Scanning Corp., 618 F.2d 222, 224 (2d Cir. 1980).
 
 The Third Party Complaint
 
 22
 The only issue remaining is the propriety of the district court's dismissal of MCI's third-party complaint against AT&T. We affirm on the ground that while MCI attempts to state a claim for indemnification, it cannot meet the requirements for doing so under applicable state law.[14] California law provides for three basic categories of indemnification. Two of the three rest on the existence of a contractual relation between the indemnitor and indemnitee. In the absence of a contractual relation between MCI and AT&T, the first two branches of this doctrine are clearly inapplicable. The third, implied non-contractual, or "equitable," indemnity "involves the equitable considerations of primary and secondary liability, or, to put it differently, concepts of active and passive conduct." San Francisco Examiner Div. v. Sweat, 248 Cal.App.2d 493, 497, 56 Cal.Rptr. 711 (1967); see Rossmoor Sanitation, Inc. v. Pylon, Inc., 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97 (1975).
 
 
 23
 The third category of indemnification has served to provide a means for the courts to allocate liability for damages among certain types of joint tortfeasors. See Bill Loeper Ford v. Hites, 47 Cal.App.3d 828, 832, 121 Cal.Rptr. 131 (1975).[15] It has not been utilized as a mechanism for one party to avoid a claim of breach of contract by asserting that it was required to enter into the contract as a result of a wrongful refusal by a third party to deal with it. Clearly MCI and AT&T are not joint tortfeasors, and we are referred to no authority under California law that would justify the use of indemnification in the manner suggested by MCI. California case law strongly supports AT&T's position that indemnification simply cannot be relied on as a basis for the third-party complaint in this case. E. g., Commercial Standard Ins. Co. v. Bank of America, 57 Cal.App.3d 241, 246, 129 Cal.Rptr. 91 (1976). Under these circumstances, we would not reverse the determination of the district judge that the third-party complaint fails to state a cause of action under California law. See Lewis v. Anderson, 615 F.2d 778, 781 (9th Cir. 1979). Dismissal was therefore proper.
 
 Conclusion
 
 24
 The judgment of the district court is affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Elbert Parr Tuttle, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 MCI, a Delaware corporation with its principal place of business in Washington, D. C., removed the action to the district court pursuant to 28 U.S.C. sections 1441 and 1332(a). PT&T is incorporated, and has its principal place of business, in California
 
 
 [2]
 On April 15, 1975, AT&T refused MCI's April 10th order for service under Tariff F.C.C. No. 260, because the order did not meet the then applicable "customer premises" requirements of the tariff. Had AT&T provided service under this tariff, MCI would have been billed approximately $32,000 per month. On April 18, AT&T informed MCI that the request under Tariff F.C.C. No. 266 could not be met by the July 1 service date required under the contract between MCI and GMC. The charge for service under this tariff would have been approximately $52,000 per month
 
 
 [3]
 In a separate proceeding, but on the same day as its order denying emergency relief to MCI, the F.C.C. directed AT&T to modify its Tariff F.C.C. No. 260 so as to eliminate the restriction that had led to the denial of the order MCI submitted sixteen months earlier on GMC's behalf. The Commission found that the "customer premises" restriction, which required that AT&T private line service be connected at the premises of the customer (i. e., not another carrier), was unlawful. American Telephone and Telegraph Co., 60 F.C.C.2d 939, 942 (1976). It found the restriction inconsistent with prior decisions of the Commission and the courts. Id. at 944. However, when MCI subsequently filed its formal complaint and requested that the American Telephone and Telegraph decision be applied retroactively, the Commission found it unnecessary to reach that issue. See text accompanying note 4, infra
 
 
 [4]
 MCI Telecommunications Corp., 74 F.C.C.2d at 192-93 and n.14. The Commission noted that AT&T's tariff defined resale as "the provision of communications services and facilities to an intermediary who then reoffers the services and facilities to the public, irrespective whether the offering is made at cost or cost plus profit." Id. at 192 n.14, quoting Resale and Shared Use, 60 F.C.C.2d at 277
 
 
 [5]
 60 F.C.C.2d 261, 289 (1976) reconsideration granted in part 62 F.C.C.2d 588 (1977), aff'd sub nom. American Telephone and Telegraph Co. v. F.C.C., 572 F.2d 17 (2d Cir.), cert. denied 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978). The "customer premises" decision was handed down the same day that the Commission denied MCI's original petition for emergency relief
 
 
 [6]
 The Commission explained:
 (W)e believe that the Commission is given greater flexibility in the formulation of policy if we can formulate it prospectively without necessarily having to concern ourselves with an unascertainable number of claims for damages that could result from retroactive application.
 Id. at 194.
 
 
 [7]
 The district court had earlier dismissed MCI's third party complaint against AT&T, without waiting for the F.C.C.'s decision
 
 
 [8]
 It appears from the record that the district court was of the same opinion. See text and note at note 13, infra
 
 
 [9]
 See Baldwin v. Scott County Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943, 83 L.Ed. 1409 (1939); United States v. Associated Air Transport, Inc., 275 F.2d 827, 833 (5th Cir. 1960)
 
 
 [10]
 Paragraph 34 of MCI's Answer reads:
 The sum now claimed by PT&T is an illegal charge arising from unlawful acts of AT&T/PT&T in violation of federal laws and for which MCI has received no service over and above the cheaper service to which it was lawfully entitled. Accordingly, MCI has no debt to PT&T.
 
 
 [11]
 In its Memorandum in Opposition to the summary judgment motion, MCI set forth three provisions of the Act under which it alleged that AT&T's actions were unlawful. They are 47 U.S.C. sections 201(a), (b), and 202(a)
 Section 201(a) requires common carriers to provide interconnections to other carriers "upon reasonable request therefor" and a finding by the Commission after hearing that "such action (is) necessary or desirable in the public interest." Section 201(b) provides that "(a)ll charges, practices, classifications, and regulations for and in connection with such communication service shall be just and reasonable " Section 202(a) makes unlawful"any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service " (Emphasis added throughout).
 The Commission's order vacating its earlier decision states expressly that AT& T's actions will be reappraised in order to determine whether they violated sections 201(b) or 202(a). Memorandum Opinion and Order, MCI Telecommunications Corp., F.C.C. Docket No. 81-217 (March 26, 1981) at 9.
 
 
 [12]
 In Marine Terminal Ass'n, the Association had revised a tariff on file with the Federal Maritime Commission so as to shift certain charges from consignees of freight to the carriers. When certain carriers refused to pay these charges, the Association brought an action in state court for damages. The carriers removed to federal court and defended on the ground the revised tariff was not within the scope of the Terminal Association's operating agreement, which had been approved by the FMC, and that it therefore could not become effective without the Commission's approval. The district court stayed proceedings and referred the question to the Commission. The carrier argued to the Supreme Court that the district court had erred in referring this issue; the Court responded:
 But this Court recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge. The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed. When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved.
 400 U.S. at 68, 91 S.Ct. at 208 (footnote and citations omitted).
 
 
 [13]
 MCI's Supplemental Memorandum in Opposition to AT&T's motion to dismiss the third-party complaint indicates that Judge Pregerson alerted the parties to the primary jurisdiction issue by directing their attention to his opinion in Macom Products Corp. v. American Telephone & Telegraph Co., 359 F.Supp. 973 (C.D.Cal.1973), where he referred certain issues in an antitrust action to the F.C.C
 Although properly deferring to the F.C.C. on the question of whether AT&T had violated the Act, the district court gave no apparent weight to the Commission's comment, in its order denying MCI's petition for emergency relief, that was MCI obligated to pay PT&T regardless of any unlawfulness. The order denying reconsideration of the order containing that statement was vacated by the Commission. In view of the present state of the proceeding, there is no likelihood that the district court will be required to consider the effect to be given the comment. However, we do not disagree with the district court's failure to give it any significant weight. We note that the Commission was neither asked nor required to decide the question of MCI's obligation to make the payments. Some question exists as to the Commission's authority to rule on that issue and, although we need not here decide the question, it may well be that the issue is one more appropriate for resolution by the courts.
 
 
 [14]
 It is unnecessary, in our view, to reach the question of whether section 207 of the Communications Act bars the assertion of a third-party claim when the third-party plaintiff has already initiated a proceeding before the Commission asserting the same claim against the same defendant, and we decline to do so. This is because MCI has failed to establish a right to indemnification by AT&T under California law, a prerequisite to the third-party complaint in this case. 3 Moore's Federal Practice par. 14.03(3) (2d ed. 1980) at 14-156; see also Howey v. United States, 481 F.2d 1187, 1191-92 and n.5 (9th Cir. 1973)
 
 
 [15]
 The court there summarized the doctrine as follows:
 The right to noncontractual implied indemnity rests upon equitable considerations, impelled by a contrast between the secondary, passive role of one tortfeasor and the primary, active role of the other. When applicable, the doctrine permits one or two tortfeasors to shift the entire loss to the other when, without active participation in the wrong on the former's part, he has been compelled by some legal obligation to pay damages occasioned by the active negligence of the latter tortfeasor which was the proximate cause of the loss.
 Id. (citations omitted).