[No. G023734. Fourth Dist., Div. Three. Aug. 12, 1999.]

CITY OF COSTA MESA et al., Plaintiffs and Appellants, v. KATHLEEN CONNELL, as Controller, etc., et al., Defendants and Respondents.

## COUNSEL

Thomas A. Kathe, City Attorney; Fulbright & Jaworski, Thomas A. Freiberg, Jr., and Todd M. Sorrell for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Linda A. Cabatic, Assistant Attorney General, Paul H. Dobson and Keith Yamanaka, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

SEYMOUR, J.*—In this case of first impression, we conclude an elaborate bond-and-lease plan for funding a street widening project violates article XIX of the California Constitution.[1] The trial court correctly concluded the City of Costa Mesa (the City) was misspending restricted-use state gas tax funds to pay rent on two golf courses.

In reaching our decision, we reject the City's facile argument that because the money ultimately paid for street improvements, the circuitous route it took is irrelevant. The issue is not whether equivalent dollars were dropped into the bin labeled "Street Improvements" after the wash was done, but whether article XIX permits either direct expenditure of state gas tax funds on golf course leases or indirect routing to finance bonds which are

---

*Judge of the Orange Superior Court, assigned bt the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further constitutional references are to the California Constitution.

not voter approved. As we will explain, neither transaction passes constitutional muster.

FACTS

Costa Mesa Public Finance Authority (PFA) is a joint powers authority of the City and its redevelopment agency. To raise funds for street widening, the City and PFA devised the following mechanism: (1) The City leased two municipal golf courses to PFA; (2) PFA issued $15 million of lease revenue bonds and paid about $13 million of the proceeds to the City as a one-time lease payment for the golf courses. The bonds were not voter approved; (3) the City applied approximately $9 million of the funds to the street improvement project; (4) the City subleased the golf courses back from PFA. Under the lease-back, the City was obligated to make payments to PFA coinciding with the timing and amount of PFA's debt service payments due on the bonds; (5) the City's lease-back payments to PFA consisted, in part, of state gas tax revenues from its special gas tax street improvement fund. The portion of the payments made with gas tax moneys was equal to the portion of bond proceeds the City spent on the street widening project; and (6) PFA pledged the lease-back payments to service the bond debt.

When the state Controller's office (SCO) audited the City's special gas tax street improvement fund for the fiscal year ending June 30, 1993, it issued a draft report finding the lease-back payments constituted a misuse of more than $70,000 of gas tax money. It recommended the City reimburse the fund. In response, the City argued the roundabout financial transaction was ultimately for street improvement, thus the SCO erroneously elevated form over substance when it concluded the funds were misused.

The SCO held its ground. In its final audit report, it found, "The [City] charged $71,771 in ineligible expenditures to the Special Gas Tax Street Improvement Fund that were for the lease of two golf courses from the [PFA]. [¶] The PFA used the City's lease payments to pay voter-approved [sic] bond debt service. Under Article 19, Section 5, of the California State Constitution: [¶] The Legislature may authorize up to 25% of the revenues available for expenditure by any City . . . for the purposes specified in subdivision (a) of Section 5 of this article to be pledged or used for the payment of principal and interest on voter-approved bonds issued for such purposes. [¶] Although the PFA may elect to use the lease money for debt service of lease revenue bonds, the City's payments for the lease of two golf courses is not a street-related expense. Therefore, the City's contractual lease-back payments of $71,771 made to the PFA are ineligible Special Gas Tax Street Improvement Fund expenditures. Also, interest in the amount of

$3,804 was earned related to these funds, which should have been credited to the fund." The final report further noted, "Section 5 of Article 19 of the Constitution only permits the use of gas tax money, if authorized by the Legislature, for debt service on 'voter-approved bonds.' Accordingly, the [lease-back] payments in question cannot be considered as authorized or permitted bond debt service payments."

The City and PFA petitioned for a writ of mandate in the superior court, asking the court to direct the SCO to set aside its findings. They prayed for a declaration that the City's use of the gas tax funds to make lease-back payments on the golf courses was acceptable. The court denied relief.

## DISCUSSION

Before turning to the arguments of the City and PFA (hereafter, appellants except where individual identification is needed), we set forth an overview of the law. California has a "Highway Users Tax Account" into which it deposits state gas tax funds. (Sts. & Hy. Code, § 2100.)[2] All of the moneys in the account are appropriated for public streets and highways, public mass transit and related purposes. (§ 2102.) The state Controller apportions state gas tax funds according to statutory directives. (§ 2103.)

Cities are eligible to receive a share of state gas tax funds under various criteria. (§§ 2106 & 2107.) To receive such funds, the city must create "a special gas tax street improvement fund" into which all gas tax moneys are deposited. (§ 2113.) The city's use of the moneys must accord with article XIX and the provisions of section 2100 et seq. Article XIX, section 1, provides in relevant part: "Revenues from taxes imposed by the state on motor vehicle fuels for use in motor vehicles upon public streets and highways . . . shall be used for the following purposes: [¶] (a) The research, planning, construction, improvement, maintenance, and operation of public streets and highways . . . ." Under article XIX, section 5: "The Legislature may authorize up to 25 percent of the revenues available for expenditure by any city . . . for the purposes specified in subdivision (a) of Section 1 . . . to be pledged or used for the payment of principal and interest on voter-approved bonds issued for such purposes." Section 2107.4 likewise limits a city's spending. In pertinent part, it provides: "Not more than one-quarter of the funds allocated to a city . . . from the Highway Users Tax Account . . . for the construction of streets therein may be used to make principal and interest payments on bonds issued for such construction, if the issuance of such bonds is authorized by a proposition approved by a majority of the votes cast thereon."

---

[2]All further statutory references are to the Streets and Highways Code unless otherwise stated.

In this appeal, appellants present three arguments: (1) the City's use of the funds to sublease the golf courses is a permissible indirect street-related expenditure; (2) gas tax moneys may be used for debt service on bonds that are not voter approved; and (3) the SCO, having approved a similar 1988 bond-and-lease procedure, is equitably estopped from "punishing" the City for using the same financing mechanism in 1990. As we will now discuss, we find the arguments uniformly without merit.

## I

Appellants contend a city need not spend state gas tax funds directly on street improvement projects, but may channel the funds indirectly to achieve the same purpose. In support of this general proposition, they superficially trace the history of article XIX, section 1, noting its progenitor, former article XXVI, section 1 (repealed in 1974), mandated use of the moneys *"exclusively and directly* for highway purposes" (italics added), but the amended and renumbered successor version contains no qualifying adjectives, simply stating, "[Gas tax moneys] shall be used for the following [designated] purposes . . . ." (Art. XIX, § 1.) They conclude the deletion of the words "exclusively and directly" indicates an intent to permit indirect expenditures of state gas tax funds.

True, the deletion of limiting language shows an intent to eliminate the limitation. (*Kern County Water Agency* v. *Belridge Water Storage Dist.* (1993) 18 Cal.App.4th 77, 86 [22 Cal.Rptr.2d 354].) Thus, we agree article XIX, section 1 does not prohibit indirect street-related expenditures of state gas tax funds. But that should be of scant comfort to appellants, because the deletion of one restriction is not the equivalent of a carte blanche to disregard other restrictions. There still remains the prohibition against using state gas tax funds to service the debt on bonds not approved by voters. (See pt. II, *post.*) For that reason, the indirect expenditure here (to be rerouted to pay the debt on unapproved bonds) is an illegitimate use of the moneys. And since golf courses are not public streets or highways (see definition, art. XIX, § 1, subd. (a)), the direct expenditure for the sublease payments on the golf courses is an impermissible use of state gas tax funds.

Appellants cite two California Attorney General opinions which they contend demonstrate the acceptability of the financing here. Neither opinion is apt.

In the first, 57 Ops.Cal.Atty.Gen. 142 (1974), the Attorney General reasoned a city could not spend state gas tax funds for greenbelt acquisition because pre-amendment article XXVI, section 1, contained no express legislative authority for such a purpose. When the article was later amended, it

contained a provision permitting the use of state gas tax moneys for "mitigation of [the] environmental effects [of public streets and highways]." (Former art. XXVI, § 1, now art. XIX, § 1.) Appellants claim that the opinion and the subsequent amendment, taken together, mean gas tax moneys may be used on indirect, street-related projects, such as the bond-and-lease financing plan. That claim does not withstand scrutiny. There is no meaningful relationship between greenbelt acquisition and golf course subleasing; nor is there any reasonable basis for interpreting the amendment to permit the circuitous financing at issue here.

The second opinion, 64 Ops.Cal.Atty.Gen. 218 (1981) concluded the Legislature could appropriate gas tax funds for loans and loan guarantees for businesses blighted by the Century Freeway project through nine cities in Los Angeles County. The expenditure was allowable to mitigate the undeniable, devastating environmental effects of the project, which "include[d] the displacement of businesses and the disruption of the commercial viability of the adjoining communities [along the corridor]." (*Id.* at p. 222.) We fail to see any legally significant connection between the environmental expenditure endorsed by the Attorney General in that situation and the expenditure appellants attempt to justify here, where the only issue is the use of gas tax funds.

From a fallback position, appellants argue bond-and-lease financing is a widely accepted, conventional mechanism which has been approved by the Supreme Court in *Rider* v. *City of San Diego* (1998) 18 Cal.4th 1035 [77 Cal.Rptr.2d 189, 959 P.2d 347]. But the plan's popularity is neither determinative nor indicative of its constitutionality, and *Rider*, which we discuss in part II, *post*, deals with balanced budgets, not state gas tax funds. It is inapt. In short, no legislative or decisional law supports appellants' argument that the City's use of state gas tax funds to sublease the golf courses is a permissible street-related expenditure.

## II

■ Article XIX, section 5 permits a public entity to use up to 25 percent of its apportioned share of gas tax revenues for the payment of principal and interest on voter-approved street improvement bonds. Appellants argue section 5 serves to cap spending only when voter-approved bonds are at issue. In regard to bonds not approved by the voters, they contend, we should look to article XIX, section 1, which directs the use of gas tax moneys for street and highway improvement purposes, but does not specify any other limitation on expenditure of the funds. Under appellants' interpretation, the law limits the amount of gas tax funds spent on bonds approved by the voters,

but permits unlimited expenditures from the same funds on bonds not approved by the voters. We find the argument lacking in plain old common sense.

We construe constitutional enactments in a manner that comports with reason, avoids absurd results and "fulfill[s] the apparent intent of the framers. [Citation.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) In that light we examine article XIX's history.

At the June 4, 1974, Primary Election, the voters passed Proposition 5, repealing article XXVI, sections 1 through 4, replacing it with article XXVI, sections 1 through 7. The repealed article XXVI, section 1 contained a prohibition against the use of gas tax moneys for the payment of bonds except as issued by special assessment districts. (See 47 Ops.Cal.Atty.Gen. 145, 146, 148 (1966).) The revised article XXVI, section 1, deleted all reference to bond financing and special assessment districts. The new section 5, on the other hand, added an authorization to use up to 25 percent of gas tax moneys for voter-approved bond financing.

There is only one reasonable interpretation of the two sections, now renumbered article XIX, sections 1 and 5, as read together: The voters decided to permit, for the first time, expenditure of gas tax funds on bonds other than those issued by special assessment districts, but *only* on bonds they themselves had approved. This interpretation is buoyed by the Legislative Counsel's analysis of Proposition 5 contained in the ballot pamphlet.[3] That analysis states the measure would permit a broadened use of gas tax revenues, including the use of up to 25 percent for voter-approved bond financing. There is no mention of unlimited use of revenues for non-voter-approved bond financing.

Appellants argue the implementing statute, section 2107.4, implies there is no spending limitation on bonds that are not voter approved. Once again, we decline to adopt their distorted interpretation, which would lead to absurd results. The statute provides not more than 25 percent of the funds may be used to pay principal and interest on street construction bonds "*if* the issuance of such bonds is authorized by a proposition approved by a majority of the votes cast thereon." (§ 2107.4, italics added.) The "if" does not signify an authorization by default to use state gas tax funds on non-voter-approved bond financing. Rather, the "if," taken in the context of the qualifying phrase

---

[3] In construing the provision, we may consider the analysis and arguments contained in the official ballot pamphlet as indicative of the voters' intent. (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 504 [286 Cal.Rptr. 283, 816 P.2d 1309].)

as a whole, means no more than that a percentage of the funds may be used for bond financing of voter-approved bonds. Such a reading of the statute is compatible, rather than at odds, with the constitutional limitation set forth in article XIX, section 5.

 Appellants forge on, contending it is irrelevant whether the bonds were voter approved because they were issued by PFA, which is not required to obtain voter approval to issue bonds. (Gov. Code, § 6584 et seq.) This argument misses the point. The SCO did not charge PFA with acting unlawfully in issuing the bonds; it charged the City with misusing gas tax moneys to make payments on non-voter-approved bonds. But, the City protests, the bond debt is PFA's, not the City's. That is irrelevant. The point is the City either used the funds to make payments on golf courses, which is not permitted, or it used the funds to make payments on non-voter-approved street improvement bonds. As we have explained, in either event, the moneys were misused.

Undaunted by the lack of law or reason supporting their position, appellants argue we should endorse their creative financing scheme because the Supreme Court approved a similar convoluted transaction in *Rider* v. *City of San Diego, supra,* 18 Cal.4th 1035. There, a joint powers authority leased convention center property from the port district, sublet the property to the city, issued bonds to finance expansion of the convention center, and used the city's sublease payments to service the bond debt. The court held the city's rent obligation did not violate balanced budget laws, article XVI, section 18, or the city's charter, requiring a two-thirds voter approval for a city to incur debt greater than its income and revenue. (18 Cal.4th at p. 1049.) It stated, "In [lease agreements], we have reasoned that a debt for the aggregate of all rent payments does not arise at the time the parties execute the lease so long as liability for each individual rent payment is contingent on continued use of the leased property during the period corresponding to that rent payment. [Citation.]" (*Id.* at p. 1047.)

*Rider,* while coincidentally involving a bond-and-lease plan, is of no help to appellants. Simply stated, it does not deal with the use of state gas tax funds, which is the only issue before us. Likewise, we need not linger on appellants' other cited cases, *Dean* v. *Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521] and *City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358]. Both are discussed in *Rider,* and neither pertains to the expenditure of state gas tax funds.

## III

Finally, appellants argue equitable estoppel, contending they relied on the SCO's approval of a similar 1988 bond-and-lease deal in which the Costa

Mesa City Hall and Public Safety Facilities, Inc., issued bonds and sublet a street back to the City. Of course, the sublease of a street is probably distinguishable from the sublease of golf courses, and the former might well justify the expenditure of state gas tax funds. But we need not decide since other grounds are dispositive of the equitable estoppel argument.

The problem appellants face is that the memorandum upon which they assertedly relied is dated June 14, 1996, six years after the subject bonds were issued and three years after the City used the 1993 gas tax revenues to pay those bonds! ■ Detrimental reliance is a requisite element for the application of equitable estoppel. (See *Lentz* v. *McMahon* (1989) 49 Cal.3d 393, 399 [261 Cal.Rptr. 310, 777 P.2d 83].) Here, appellants cannot prove reliance.

Appellants alternatively argue that even if estoppel does not apply, article XIX, sections 1 and 5 cannot be asserted against them because the constitutional provisions are void for vagueness. The argument is presented for the first time in appellants' reply brief, and they have offered no explanation for their earlier omission. ■ "We do not entertain issues raised for the first time in a reply brief, in the absence of a showing of good cause why such issues were not raised in the opening brief." (*Scott* v. *CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 322 [44 Cal.Rptr.2d 902].)

The judgment is affirmed. The SCO shall recover its costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.