Filed 11/25/14  Victor Valley Econ. Dev. Auth. v. California CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| VICTOR VALLEY ECONOMIC DEVELOPMENT AUTHORITY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants and Respondents. | C072518<br><br>(Super. Ct. No. 34-2012-80001113-CU-WM-GDS) |

This case arises out of the legislative dissolution of California redevelopment agencies.  Plaintiff Victor Valley Economic Development Authority (Victor Valley), formed to oversee the reuse of a former military base, sued the State of California and various officials (collectively, the State), contending Victor Valley should retain its redevelopment powers.  Following a dismissal based on a demurrer sustained without leave to amend, Victor Valley appeals, contending:  (1) it is not a redevelopment agency;

1

(2) it is entitled to continue to receive tax money; (3) dissolving it would impair obligations and be preempted by federal law; and (4) it can amend to state a viable cause of action.

The trial court correctly ruled that Victor Valley's redevelopment powers were lawfully stripped from it by the Legislature. Nor has Victor Valley identified any specific *material* facts it might allege if given leave to amend. During the briefing and oral argument on appeal, the parties agreed that the judgment *does not* require that Victor Valley itself be dissolved. Although we do not read the judgment as compelling such dissolution, to ensure there is no later confusion on this point, we shall modify the judgment to include an explicit clarification of this point, and affirm as modified.

## STANDARD OF REVIEW

When reviewing a judgment following an order sustaining a demurrer, "we examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. [Citation.] We treat the demurrer as admitting all material facts which were properly pleaded. [Citation.] However, we will not assume the truth of contentions, deductions, or conclusions of fact or law [citation] and we may disregard any allegations that are contrary to the law or to a fact of which judicial notice may be taken." (*Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947; see *Blank v. Kirwin* (1985) 39 Cal.3d 311, 318.) We may also accept the factual stipulations of counsel. (See, e.g., *Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 402 [judgment on the pleadings, mutual concessions at oral argument accepted as true].)

## BACKGROUND

*Legal Background Regarding Redevelopment Agencies*

As briefly summarized by our Supreme Court:

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay. [Citations.] The Community Redevelopment Law [CRL] 'was intended to help

2

local governments revitalize blighted communities.' [Citations.] It has since become a principal instrument of economic development, mostly for cities, with nearly 400 redevelopment agencies now active in California." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-246 (*Matosantos*).)

"Responding to a declared state fiscal emergency, in the summer of 2011 the Legislature enacted two measures intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies. (Assem. Bill Nos. 26 & 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (hereafter Assem. Bill 26 and Assem. Bill 27) [Citations].) [Assem. Bill 26] bars redevelopment agencies from engaging in new business and provides for their windup and dissolution. [Assem. Bill 27] offers an alternative: redevelopment agencies can continue to operate if the cities and counties that created them agree to make payments into funds benefiting the state's schools and special districts." (*Matosantos*, *supra*, 54 Cal.4th at p. 241.)

Our Supreme Court invalidated Assembly Bill 27, because it conflicted with a provision of the California Constitution forbidding the payments required thereunder. (*Matosantos*, *supra*, 54 Cal.4th at pp. 242, 264-274.) Thus, the only lawful option for redevelopment agencies was windup and dissolution, as provided by Assembly Bill 26, set forth in the Health and Safety Code,[1] although *Matosantos* judicially reformed certain dates in Assembly Bill 26 to best effectuate the Legislature's intent. (*Matosantos*, at pp. 274-276.)

Assembly Bill 26 provided that successor agencies would "[e]xpeditiously wind down the affairs of the redevelopment agency pursuant to the provisions of this part and in accordance with the direction of the oversight board." (§ 34179, subd. (h).) Each oversight board consists of members appointed as set forth by statute (§ 34179, subd. (a)), and has a fiduciary duty towards "holders of enforceable obligations and the taxing entities that benefit from distributions of property tax" (§ 34177, subd. (i)), including the duty to review specified actions by the successor agencies, such as "Establishment of the

_____

[1] All undesignated statutory references are to the Health and Safety Code.

3

Recognized Obligation Payment Schedule [ROPS]." (§ 34180, subd. (g).) The ROPS is "the document setting forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period." (§ 34171, subd. (h).) The successor agency must "[c]ontinue to make payments due for enforceable obligations." (§ 34177, subd. (a).) " 'Enforceable obligation' " is defined by section 34171, subdivision (d)(1), to include, inter alia, "Payments required by the federal government," "Any legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy, " and "Contracts or agreements necessary for the administration or operation of the successor agency . . . ." (§ 34171, subd. (d)(1)(C), (E), and (F).)

We continue our discussion of Assembly Bill 26 in Part I of the Discussion, *post*.

*Procedural Background*

Because a major contention by Victor Valley pertains to the timing and manner of its formation, we set out facts regarding Victor Valley chronologically.

After Congress passed the Defense Authorization Amendments and Base Closure and Realignment Act in 1988 (Pub. L. No. 100-526; 102 Stat. 2623), George Air Force Base (George) and Norton Air Force Base (Norton) were selected for closure.

The Eaves Bill, former section 33320.5 (now § 33492.40), part of the CRL, was signed on September 20, 1989. (Stats. 1989, ch. 545, § 1.) It anticipated creation of joint powers authorities (see Gov. Code, § 6500 et seq.) to oversee the transition of George and Norton.

On or about October 27, 1989, Victor Valley was formed by multiple public entities, as a joint powers authority to plan for the closure and reuse of George.

On January 1, 1990, the Eaves Bill took effect. (See Gov. Code, § 9600, subd. (a) [ordinary bills take effect January 1 "next following a 90-day period" post-enactment].)

In 1993, Victor Valley adopted a redevelopment plan accepted by the federal government, with changes over time. In 1993 through 1994, the federal government

required that part of George be used as a civil airport with a "qualified sponsor," which Victor Valley was, and the property was given to Victor Valley on the condition that Victor Valley remediated certain environmental problems. In 1996, Victor Valley and the federal government entered into agreements whereby Victor Valley received other property in exchange for a promissory note which Victor Valley "could only honor through reliance on tax increment revenues which were designated as the primary funding source."[2]

A separate joint powers authority consisting of the City of Victorville and the Victorville Redevelopment Agency was formed to run the civil airport "as well as reduce [Victor Valley's] exposure to any possible catastrophic events which might otherwise be associated with airport operations." That entity is now the Southern California Logistics

---

[2] We must explain the term "tax increment": "[C]ounties have a mandatory duty to collect property taxes, then allocate and distribute the appropriate amounts to various taxing entities pursuant to a complex statutory scheme. [Citation.] Allocation and distribution of property tax revenue is further subject to the [CRL]. [Citation.] The CRL sets forth the procedures for financing redevelopment projects. [Citation.] Under the CRL, such projects are financed by ' "tax increment financing." ' [Citation.] [¶] Under tax increment financing, '[a]ll taxable property within the area to be redeveloped is subject to ad valorem property taxes. The properties lying within a redevelopment area have a certain assessed value as of the date a redevelopment plan ordinance is adopted. A local taxing agency, such as a city or county, continues in future years to receive property taxes on the redevelopment area properties, but may only claim the taxes allocable to the base year value. If the taxable properties within the redevelopment area increase in value after the base year, the taxes on the increment of value over and above the base year value are assigned to a special fund for the redevelopment agency. [¶] 'Once the redevelopment plan is adopted, the redevelopment agency may issue bonds to raise funds for the project. As the renewal and redevelopment is completed, the property values in the redevelopment area are expected to rise. The taxes attributable to the increase in assessed value above the base year value are assigned to the redevelopment agency, which then uses these funds to retire the bonds. The local taxing agencies still receive taxes attributable to the base year assessed value of the properties within the redevelopment area. This way, the redevelopment project in effect pays for itself.' " (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865-866, fn. omitted; see *Matosantos*, *supra*, 53 Cal.4th at pp. 246-247.)

Airport Authority (SCLAA). Victor Valley pledged tax increments generated on George to the SCLAA and assigned rights with respect to those increments to the SCLAA, pledging half of the tax increments "generated from all other properties located within the project area subject to the Redevelopment Plan . . . to SCLAA." This allowed Victor Valley to fulfill its federal obligations and facilitate reuse of George in compliance with federal law.

After our Supreme Court upheld Assembly Bill 26, Victor Valley complied with its terms "under protest," but the Department of Finance (Finance) determined that Victor Valley could not continue to exercise the powers of a redevelopment agency, and directed Victor Valley to begin to make only "payments that are listed in a [ROPS] as contemplated under [Assem. Bill 26]."

Victor Valley sued the State, seeking a writ of administrative mandamus as well as declaratory and injunctive relief, contending it was not a redevelopment agency, and sought to prevent the State from compelling compliance with Assembly Bill 26. Attached to the petition were Finance documents concluding Assembly Bill 26 stripped Victor Valley of redevelopment authority (but *not* stating Victor Valley had to be *dissolved*). Victor Valley asserted that applying Assembly Bill 26 to it would impair contracts in violation of the federal and California constitutions, and be preempted by federal law by impeding Victor Valley's base reuse obligations.

The State demurred, arguing as relevant here that Assembly Bill 26 required Victor Valley to be *dissolved*, or, alternatively, that its authority to receive tax increments or perform redevelopment activity was eliminated by Assembly Bill 26, and no impairment of contracts had been shown, because the successor agency to be created by Assembly Bill 26 would receive allocations sufficient to satisfy any enforceable federal obligations. At oral argument on appeal, the State withdrew its claim that dissolution was required.

6

Victor Valley replied that it was entitled to a declaration of rights, no pleaded facts showed Finance would satisfy obligations to the federal government, and reiterated that Assembly Bill 26 did not dissolve Victor Valley.

The trial court sustained the demurrer without leave to amend.

Victor Valley timely appealed from the judgment of dismissal.

## DISCUSSION

### I

### *The Application of Assembly Bill 26 to Victor Valley*

Victor Valley contends it is not a redevelopment agency and therefore was not subject to the provisions of Assembly Bill 26. It argues that it was created as a joint powers authority under the Government Code, not as a redevelopment agency. It adds that it was created *prior to* the effective date of the Eaves Act, therefore the fact that the Eaves Act is located in the Health and Safety Code is not relevant. We conclude Victor Valley was subject to Assembly Bill 26.

We begin with the principle that the Legislature is free, within the confines of the California Constitution, to reconfigure its various subdivisions as it chooses. (See *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6 (*Star-Kist Foods*); *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209.)

The CRL is located in part I of division 24 of the Health and Safety Code. The Eaves Bill (§ 33492 et seq.) is *within* the CRL, as Chapter 4.5 thereof, and was passed to mitigate "the economic and social degradation" caused by the closure of military bases. (§ 33492, subd. (a).) However, "Chapter 4 (commencing with Section 33300) shall be applicable to any project area formed pursuant to this chapter, except to the extent that Chapter 4 is inconsistent with this chapter." (§ 33492.4.) The referenced "Chapter 4" describes the requirements and procedures for forming a redevelopment agency. (§ 33300, et seq.) Parts of the Eaves Bill apply to specific areas, and, in particular, section 33492.40 references George and Norton, and subdivision (j) thereof provides:

7

"The Legislature finds and declares that the closure of two or more military facilities or installations within the County of San Bernardino will cause serious economic hardship in that county, including loss of jobs, increased unemployment, deterioration of properties and land utilization and undue disruption of the lives and activities of the people. Therefore, the Legislature finds and declares that to avoid serious economic hardship *and accompanying blight*, it is necessary to enact this act which shall apply only within the County of San Bernardino. In enacting this act, it is the policy of the Legislature to assist communities within the County of San Bernardino in their attempt to preserve the military facilities and installations for their continued use as airports and aviation-related purposes.

"It is the intent of the Legislature and the commitment of the local authorities to ensure that the existing airfields at both [Norton and George] are protected, developed, and enhanced as civil aviation public use airports. Therefore, the joint powers authorities authorized by this section should make every reasonable effort to guarantee that these vital airport facilities are retained for general aviation use now and into the future." (Italics added.)

The Eaves Bill also provides:

"The legislative bodies for communities having territory within, adjacent to, or in proximity to a military facility or installation described in subdivision (a) may create a separate joint powers agency pursuant to [Gov. Code, § 6500 et seq.], which shall have and exclusively exercise powers of an agency *in furtherance of the redevelopment of a project area approved by the joint powers agency*. The joint powers agency so formed shall include as one of its members the county in which the project area is located. In addition to the powers of an agency, the joint powers agency so formed shall also act as the legislative body and planning commission for all approvals and actions required by this part of legislative bodies and planning commissions *for the adoption and implementation of a redevelopment plan*. However, all land use, planning, and development decisions with regard to the land within the project area shall continue to be under the control and jurisdiction of each of the respective local legislative bodies or planning commissions, as applicable." (§ 33492.40, subd. (b), italics added.)[3]

---

[3] The Legislative Counsel's Digest to the Eaves Bill partly provides: "Under the existing [CRL], territory included within a project area . . . is required to be a predominantly urbanized area of a community . . . which is a blighted area . . . . [¶] This bill would make an exception . . . in the case of a project area containing privately owned land adjacent to, or in close proximity to, as defined, [Norton and George] which are proposed to be closed . . . . [¶] The bill would permit the legislative bodies of

8

Assembly Bill 26 in part provides: "All redevelopment agencies *and redevelopment agency components* of community development agencies created under Part 1 (commencing with Section 33000) . . . that were in existence on the effective date of this part are hereby dissolved and shall no longer exist as a public body, corporate or politic." (§ 34172, subd. (a)(1), italics added.) Although Victor Valley points out in its reply brief that " 'community development agency' " is not explicitly defined, by its terms it plausibly means an agency that "develops" a community in some fashion, which would include *re*development. Victor Valley offers no alternative candidate of meaning, except to reiterate that it is a "joint powers authority and federal base reuse authority." That does not mean it does not also function in part as a community development agency.

Further, section 34189 partly provides:

> "(a) Commencing on the effective date of this part, all provisions of the [CRL] that depend on the allocation of tax increment to redevelopment agencies . . . shall be inoperative, except as those sections apply to a redevelopment agency operating pursuant to Part 1.9 (commencing with Section 34192).

> "(b) To the extent that a provision of Part 1 (commencing with Section 33000) . . . conflicts with this part, *the provisions of this part shall control.* Further, if a provision of Part 1 . . . provides an authority that the act adding this part is restricting or eliminating, *the restriction and elimination provisions of the act adding this part shall control.*"[4] (Italics added.)

Because Victor Valley was created under the authority of part 1 of the CRL, the statute authorizing it to exercise redevelopment powers is trumped by Assembly Bill 26.

---

communities as defined under the [CRL] to form a joint powers authority for purposes of the redevelopment of territory covered by the bill. It would establish exemptions . . . from the [CRL] as necessary *for the effective redevelopment of the area . . . .*" (Legis. Counsel's Dig., Assem. Bill No. 419 (1989-1990 Reg. Sess.) 4 Stats. 1989 Summary Dig., p. 177, italics added.)

[4] Section 34189 as originally phrased in Assembly Bill 26 reads slightly differently, but the differences are not material. (See Stats. 2012, ch. 26, § 31; Stats. 2012, ch. 162, § 93.)

9

Victor Valley emphasizes that it was created under the joint powers statutes (Gov. Code, 6500 et seq.).  While the State concedes for the first time on appeal that Victor Valley might continue to exist for other purposes, Assembly Bill 26 precludes it from exercising *redevelopment powers*, which have been vested in its successor agency.[5]

We see no reason why a joint powers authority could not previously have exercised redevelopment authority, even if it also had other powers.  Indeed, a provision of the redevelopment law allowed this (§ 33210), and the published cases suggest it is not uncommon for a public agency to form a joint powers authority for redevelopment purposes.  (See *Health First v. March Joint Powers Authority* (2009) 174 Cal.App.4th 1135, 1137-1138 [joint powers authority created after closure of March Air Force Base exercises redevelopment powers]; see also *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1279 [city and its redevelopment agency formed a joint powers authority]; *City of Costa Mesa v. Connell* (1999) 74 Cal.App.4th 188, 191 [same]; *People v. Parmar* (2001) 86 Cal.App.4th 781, 788, 799 [Sacramento Housing and Redevelopment Agency is a "joint powers authority" which "serves as both housing authority and redevelopment agency for the city and the county"].)

As set forth *ante*, the Eaves Bill contemplated the use of joint powers agencies, which would exercise their powers in furtherance of the redevelopment of project areas. The fact that Victor Valley is a joint powers authority does not mean that it is exempt from Assembly Bill 26's provisions stripping it of all redevelopment authority.

Victor Valley also emphasizes that it was formed as a joint powers authority *before* the Eaves Bill became effective, but this temporal claim is not persuasive.  The

---

[5]  At oral argument, counsel for the State conceded Victor Valley, as a joint powers authority, could be the successor agency under section 34173, subdivision (c) for purposes of continuing to fulfill enforceable obligations as provided by Assembly Bill 26, and counsel for Victor Valley asserted that that, in fact, was what Victor Valley is doing.

10

Eaves Bill was signed by the Governor on September 20, 1989.  Although Victor Valley alleges it was formed a month after the Eaves Bill passed, but before its effective date, because Victor Valley seeks shelter under the Eaves Bill, we do not see how it cannot have the purpose of redevelopment, at least as part of its mission.  Indeed, its organic document provided Victor Valley would have the power to redevelop George and its environs "at such time as California law permits this [Joint Powers] Authority to exercise redevelopment powers."  Thus, Victor Valley as an entity at least partly hinged its existence on the Eaves Act.  To the extent it seeks to exercise redevelopment powers post-Assembly Bill 26, it cannot do so, except in its capacity as a successor agency to facilitate the windup of remaining enforceable obligations.   (See fn. 5, *ante*.)

As the State observes, Victor Valley's focus on issues of formation and whether it continues to exist as an *entity* misses the point.  The point is that Assembly Bill 26 precludes Victor Valley from acting as a *redevelopment agency*.

However, the State originally argued in its demurrer that Victor Valley had to be dissolved, and although the State has now withdrawn that claim, Victor Valley plausibly made the point at oral argument that a mere affirmation of the judgment of dismissal in such circumstances could cloud the question about its continued viability.  Accordingly, we shall modify the judgment to clarify that Victor Valley may continued to exist as a joint powers authority, as agreed by the parties at oral argument.

II

*The Impairment of Contractual Obligations by Assembly Bill 26*

Victor Valley contends that precluding it from obtaining tax increment funding will cause it to violate federal contracts.  In related arguments, it contends Assembly Bill 26 is preempted by the federal obligations, and also claims those obligations will be impaired in violation of the federal and California constitutions.

First, Victor Valley's opening brief is bereft of legal authority on these points, other than a passing reference to "the 'Contracts Clauses' of the United States and

11

California Constitutions," therefore these arguments are forfeited on appeal for lack of coherent argument, supported by legal authority. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3.)

Second, as explained earlier, Victor Valley's successor agency will be responsible for reporting and fulfilling outstanding enforceable obligations.[6] Part of Assembly Bill 26 provides: "It is the intent of this part that pledges of revenues associated with enforceable obligations of the former redevelopment agencies are to be honored. It is intended that the cessation of any redevelopment agency shall not affect either the pledge, the legal existence of that pledge, or the stream of revenues available to meet the requirements of the pledge." (§ 34175, subd. (a).) Further, the federal government has not intervened, and Victor Valley cannot raise claims on its behalf. Our Supreme Court has held that "subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution." (*Star Kist Foods*, *supra*, 42 Cal.3d at p. 6.) Accordingly, we reject Victor Valley's impairment of contracts and related claims.

## III

### *Leave to Amend*

Under a "a counterintuitive quirk of California appellate law" (*Connerly v. State of California* (2014) 229 Cal.App.4th 457, 460 (*Connerly*)), a plaintiff may propose new facts and theories for the first time on appeal to explain how the complaint may be amended to state a cause of action, thereby showing the trial court "abused its discretion" (Code Civ. Proc., § 472c, subd. (a)) in not granting leave to amend.[7] (See *City of*

---

[6] As stated, the successor agency is, apparently, Victor Valley itself. (See fn. 5, *ante*.)

[7] The statute dictates that we frame the issue as whether the trial court abused its discretion in denying leave to amend. (Code Civ. Proc., § 472c, subd. (a).) "This is

12

*Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746.) However, to succeed, the plaintiff "must show in what manner he can amend his complaint *and how that amendment will change the legal effect of his pleading*." (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636, italics added (*Cooper*).) Victor Valley's opening brief claims it should be given leave to amend, but never explained what material facts it would plead.

For the first time in the reply brief, Victor Valley seizes on a concession in the State's briefing, to the effect that Victor Valley may not have to be dissolved, and argues this means leave to amend should be granted. The trial court accepted the State's view at oral argument in the trial court, although the judgment of dismissal does not command dissolution of Victor Valley. As stated earlier, we agree that the judgment should be modified to state that Victory Valley was *not* dissolved by Assembly Bill 26. Such modification adequately declares the rights of the parties on the question of Victor Valley's right to exist as a joint powers authority, therefore no remand for amendment of the complaint is warranted. (See *Haley v. Los Angeles County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 292-294.)

However, Victor Valley has not tendered new facts showing it retains any *redevelopment* powers following passage of Assembly Bill 26.[8] Victor Valley merely replicates arguments we have rejected about why it should keep such powers. Thus Victor Valley has failed to point out exactly *how* it would amend to state a viable cause of action that would allow it to continue exercising redevelopment powers. (See *Cooper*,

arguably misleading and unfair." (*Connerly*, *supra*, 229 Cal.App.4th at p. 460, fn. 2.) The trial court rules on the facts and law presented in the operative complaint and moving papers on demurrer, whereas the appellate court may be presented with entirely different facts tendered to show that leave to amend is proper.

[8] As set forth in its opening brief, Victor Valley sought judicial notice of various documents, however, by previous order we denied the request for judicial notice (interim), so we disregard references to those documents. Victor Valley does not contend those documents add to its claim that it should be given leave to amend.

*supra*, 70 Cal.2d at pp. 636-637; *Cantu v. Resolution Trust Corp*. (1992) 4 Cal.App.4th 857, 889-890.)  Therefore, we decline to grant leave to amend.

## DISPOSITION

The judgment is modified to add a sentence stating:  "This judgment does not compel the dissolution of Victor Valley as a joint powers authority."  The trial court is directed to prepare a new judgment containing such modification.  As so modified, the judgment is affirmed.  The parties shall bear their own costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(3).)

                                           DUARTE           , J.

We concur:

       BLEASE          , Acting P. J.

       ROBIE           , J.