Filed 10/31/16

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF BAKERSFIELD,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>WEST PARK HOME OWNERS<br>ASSOCIATION AND FRIENDS,<br><br>   Defendant and Appellant. | F071869<br><br>(Super. Ct. No. CV280593)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Brumfield & Hagan, Robert H. Brumfield III and Kristin A. Hagan for Defendant and Appellant.

Kutak Rock and Neil L. Arney for Plaintiff and Respondent.

-ooOoo-

California Constitution[1], article XVI, section 18, prohibits certain public entities, including cities, from incurring indebtedness without a two-thirds vote of the qualified electors.  Nevertheless, alternative constitutionally permissible financing methods exist.

---

[1]     All further constitutional references are to the California Constitution.

Respondent, City of Bakersfield (City), proposed to finance road improvement projects through a public benefit corporation and pay the debt from revenues held in special funds. The City filed an action seeking validation of this finance plan under Government Code section 53511 and Code of Civil Procedure section 860 et seq. Appellant, West Park Home Owners Association and Friends (West Park), opposed the finance plan.

West Park challenges the trial court's judgment validating the City's proposed plan. According to West Park, the circumstances do not qualify as exceptions to the voter approval requirement of the California Constitution. West Park further argues the City could not use gas tax revenues to pay the debt.

Contrary to West Park's position, the overall financing scheme is valid. However, the City cannot use gas tax revenues as part of the financing. Accordingly, the judgment will be affirmed in part and reversed in part.

## BACKGROUND

In July 2013, the Bakersfield City Council, the City's governing body, adopted a resolution authorizing the formation of the Bakersfield Public Benefit Corporation (Corporation). This nonprofit public benefit corporation was formed as a separate entity to finance and develop public improvement projects. To carry out its purposes, the Corporation has the power to "borrow the necessary funds."

To finance the construction, improvement, maintenance, and operation of certain public street and highway projects (Projects), the City Council passed a resolution in September 2013 authorizing the City to enter into various agreements. These agreements include: (1) an installment sale agreement between the City and the Corporation; (2) a certificate purchase agreement authorizing the City and the Corporation to sell certificates of participation to raise funds for the Projects; and (3) a trust agreement designating a trustee to act with respect to the funds received from the sale of the certificates.

2.

The installment sale agreement defines the relationship between the City and the Corporation with respect to the Projects. The Corporation will "cause the design, acquisition and construction" of the Projects for, and sell the Projects to, the City. In turn, the City will pay the purchase price of the Projects, plus interest and an administration fee, in installments as set forth in an installment payment schedule.

To carry out its obligation to make the installment payments, the City will irrevocably pledge (1) the gas tax revenues received and deposited in the gas tax fund; (2) the transportation impact fee revenues received and deposited in the transportation impact fee trust fund; and (3) the restricted utility franchise and surcharge revenues received and deposited in the roads program utility franchise fee and surcharge fund. While the City's obligation to make the installment payments is described as "absolute and unconditional," it is nevertheless subject to the following liability limitation:

> **"Section 8.01. Liability of City Limited to Revenues.**
> Notwithstanding anything contained herein, the City shall not be required to advance any moneys derived from any source of income other than the Revenues for the payment of the 2013 Installment Sale Payments or for the performance of any agreements or covenants required to be performed by it contained herein.
>
> **"**The obligation of the City to make the 2013 Installment Sale Payments is a special obligation of the City payable solely from the Revenues as provided herein, and does not constitute a debt of the City or of the State of California or of any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction."

The trust agreement is the mechanism by which the certificates issued and sold to raise funds for the Projects are to be administered. The trust agreement will be entered into by the City, the Corporation, and a trustee. Under this agreement, the trustee is authorized to prepare the certificates in an amount equal to the aggregate principal amount of the installment sale payments to be made by the City to the Corporation. Thereafter, the trustee is to deliver the certificates to the certificate purchasers upon payment of the purchase price.

The trust agreement also requires the Corporation to assign its rights to receive the installment sale payments from the City to the trustee. These amounts are to be held in trust and then used by the trustee to pay the certificate owners.

In October 2013, the City filed a complaint under Government Code section 53511 and Code of Civil Procedure section 860 et seq. to validate the proposed plan to finance the Projects. West Park appeared as an interested party and answered the complaint.

Following a hearing, the trial court entered judgment in the City's favor. The court concluded that the City's proposed obligations would not exceed the debt limits under article XVI, section 18, because they were payable out of a special fund, not the City's general funds. The court further found that the proposed use of the gas tax revenues complied with the California Constitution. Finally, the court held that the Corporation is a valid separate legal entity, not a "sham" as urged by West Park.

## DISCUSSION

### 1. *Validation proceedings.*

A local agency, such as the City, "may bring an action to determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness." (Gov. Code, § 53511; Code Civ. Proc., § 860.) The purpose of such a proceeding is to promptly settle all questions about the validity of the agency's actions. (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 833.) It is an in rem action that binds the agency and all other persons. (*Ibid.*)

### 2. *The City's finance plan does not violate the constitution's debt limitation.*

#### a. The special fund doctrine.

Article XVI, section 18, prohibits the City from incurring "any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters." Essentially,

4.

article XVI, section 18, mandates balanced budgets. (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1045 (*Rider*).) The purpose of this constitutional protection is to safeguard the general funds and property of a public entity by preventing bondholders from forcing an increase in the taxes of, or foreclosing on the general assets and property of, the issuing entity to obtain payment. (*City of Redondo Beach v. Taxpayers, Property Owners, etc., City of Redondo Beach* (1960) 54 Cal.2d 126, 131 (*City of Redondo Beach*).)

In light of this purpose, a judicially created exception to the voter approval requirement has evolved known as the special fund doctrine. Under this doctrine, the constitutional debt limitation provision is not violated by obligations that are "payable solely from a special fund, provided the governmental body is not liable to maintain the special fund out of its general funds, or by tax levies, should the special fund prove insufficient." (*City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 733 (*Dale*).) Thus, the indebtedness at issue must not be an indebtedness or obligation of the governmental body, here a city. Further, payments into the special fund beyond the current year cannot be a charge on the general fund. Rather, the revenue must be supplied by the agency to be benefited. (*City of Palm Springs v. Ringwald* (1959) 52 Cal.2d 620, 624 (*Ringwald*).) Accordingly, revenues pledged from a special fund do not "create a situation in which future taxpayers might be strapped with obligations incurred by a prior administration without the ability to meet those obligations or the necessary voter approval." (*Law Offices of Cary S. Lapidus v. City of Wasco* (2004) 114 Cal.App.4th 1361, 1368.)

Nevertheless, there must be a reasonable connection or nexus between the special fund revenues and the project to be financed with those revenues. Before the California Supreme Court ruled in *Dale, supra,* 45 Cal.2d 729, "there had been some doubt whether the source of revenue for the special fund had to be restricted to the improvements for which the bonds were issued or whether there could be a pledge of revenue from the entire facility or agency to be benefited." (*Ringwald, supra,* 52 Cal.2d at p. 625.) The

5.

*Dale* court adopted the broader view and concluded that the special fund doctrine applies "where the revenues of the entire existing system, as well as those of the proposed improvement, are pledged." (*Dale, supra,* 45 Cal.2d at pp. 734, 737.) Thus, in *Dale,* the court held that the city's proposal to finance interceptor sewer lines to transport sewage to a sewage treatment plant from revenues produced by the entire existing sewer system, rather than limit the revenues to those produced from the interceptor lines alone, was valid. The court found no "sound reason" to distinguish between the two sources of revenue. (*Id.* at p. 737.)

In *City of Redondo Beach,* the city proposed to finance the construction of a harbor from three sources: the operating revenues of the harbor; revenues from hydrocarbon substances from the city's tidelands; and the part of the sales, use and license taxes attributable to the additional business related to the harbor construction. (C*ity of Redondo Beach, supra,* 54 Cal.2d at pp. 129–130.) The court held that the harbor revenues and tidelands proceeds constituted special funds. However, the court concluded that the sales, use and license taxes were general revenues and therefore could not be used to repay a bond issue without having first satisfied the constitutional debt limitation provision. (*Id.* at p. 132.) Although the city sought to measure and use only those taxes attributable to the increased business due to the harbor construction, the court found that the asserted relationship of such funds to the harbor project during the life of the bonds was "too indirect and intangible to effectively remove what are ordinarily general funds from that category." (*Id.* at pp. 132–133.)

Similarly, in *Ringwald*, the court held the city's plan to pledge future revenue from the city's sales and use taxes to finance the construction of parking lots violated the constitutional debt limitation. Although the proposed revenue from the parking facilities to be acquired and street parking meters qualified as special funds, the court concluded the pledge of sales and use taxes was a charge on the general funds unrelated to the parking district. (*Ringwald, supra,* 52 Cal.2d at pp. 622, 626.)

### b. The three proposed revenue sources qualify as special funds.

As noted above, the City proposes to fund the road improvement projects through three funds: the gas tax revenues fund, the transportation impact fees fund, and the restricted utility franchise and surcharge fees fund. The gas tax revenues constitute all amounts received by the City related to the purchase of motor vehicle fuels, including amounts received under Streets and Highways Code sections 2103, 2105, 2106, and 2107. The transportation impact fees are fees paid to the City by developers to mitigate the regional traffic impacts of development projects. The restricted utility franchise and surcharge fees are a surcharge on the franchise fees imposed on Pacific Gas & Electric and Southern California Gas Company related to their use of the City's streets for transmitting and distributing electricity and gas. These funds are segregated from all other revenues and general funds and are not maintained from the City's general funds.

### i. The obligation will not be paid from general funds.

West Park contends that, under the terms of the installment sale agreement, the City will be absolutely and unconditionally held responsible for repayment of the debt if the proposed revenue sources are insufficient and therefore the City's general assets will be at risk. However, West Park is incorrect. The installment sale agreement clearly states that, notwithstanding anything contained in the agreement, the obligation of the City is payable solely from the pledged special funds "and does not constitute a debt of the City or of the State of California or of any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction."

In addition, West Park singles out the restricted utility franchise and surcharge fees as being general funds, not special funds. West Park contends that, because the City is not legally required to account for these fees in a separate fund, the City's effort to segregate the money from the general fund does not transform the money into special funds. According to West Park, the City has simply diverted what would otherwise be general funds into a special fund.

7.

The City adopted an ordinance establishing the " 'Roads Program Utility Franchise Fee and Surcharge Fund.' " This fund was to be segregated from all other revenues and general funds and not maintained from the general funds. Thus, the City did not divert what had been general funds. Rather, the fund was created to hold the new, additional surcharge to be collected from Pacific Gas & Electric and Southern California Gas Company related to their use of the City's streets. The City had the power to create this special fund by ordinance and thereby require these supplemental franchise fees to be segregated. (*Ott Hardware Co. v. Holmberg* (1916) 32 Cal.App. 229, 232–233; *Monterey Club v. Superior Court* (1941) 48 Cal.App.2d 131, 147.) Therefore, these fees qualify as special funds.

### ii. The nexus requirement is satisfied.

West Park also argues that the three sources of revenue pledged by the City to make the installment payments do not satisfy the nexus requirement under the special fund exception. West Park opines that the taxes and fees to be collected by the City have no direct correlation to the particular improvements that make up the Projects and therefore a sufficient nexus between the special funds and the Projects does not exist.

West Park interprets the special fund doctrine as requiring that the funds be derived from fees collected for providing services to those directly benefiting from the improvement or fees collected from the overall system of which the improvement is incorporated. West Park argues that, because neither the road improvements nor the overall highway system of which they are a part are revenue generating enterprises, the special fund exception does not apply. According to West Park, the sources of revenue proposed by the City have no direct correlation to the Projects and thus do not constitute special funds.

However, West Park is reading the cases discussing the special fund exception and the reasonable nexus requirement too narrowly. While in some cases the revenue from the improvement itself generates the funds, it is not required. (*Dale, supra,* 45 Cal.2d at

8.

pp. 734, 737.) It is also not necessary for the existing system or agency of which the improvement is a part to itself generate all of the revenue directly from the services it provides. For example, in *City of Redondo Beach, supra,* the court concluded that revenues from exploiting the hydrocarbon substances in the city's tidelands could be a special fund source for construction of a harbor despite such hydrocarbon production being separate from the business of the harbor. The court opined "[t]here can be little doubt that the … tidelands proceeds constitute such special funds." (*City of Redondo Beach, supra,* 54 Cal.2d at p. 132.)

Here, the entire system consists of the City's streets and highways. All of the revenues are either taxes or fees paid by individuals or companies for the use of, and/or impact on, these streets and highways. The gas tax is imposed on motor vehicle fuels for use in motor vehicles upon public streets and highways (art. XIX, § 2, subd. (a)) and thus the revenues are generated by the public's use of those streets and highways. The transportation impact fees are imposed "so as to assure that new development bears a proportionate share of the cost of capital expenditures necessary to provide a regional transportation system" in that all development projects have an impact on, and increase the need for, the regional transportation system. Finally, the restricted utility franchise and surcharge fees are imposed to compensate the City for the use of its streets to transmit and distribute electricity and gas.

The Projects are improvements to the City's streets and highways that are necessary to maintain the system. The revenues derive from the same system of streets and highways of which the Projects are a part and are related to the use of, and impact on, that system. Accordingly, a reasonable nexus exists between the revenues and the Projects that will be financed by those revenues.

**3.      *The City cannot pledge gas tax revenues to make the installment payments.***

As noted above, the City receives a share of state gas tax funds that it must deposit in a " 'special gas tax street improvement fund.' " (Sts. & Hy. Code, §§ 2106, 2107,

9.

2113.)  The use of these funds is restricted by article XIX, section 2.  That section provides, in part:  "Revenues from taxes imposed by the state on motor vehicle fuels for use in motor vehicles upon public streets and highways … shall be used solely for the following purposes:  [¶] (a) The research, planning, construction, improvement, maintenance, and operation of public streets and highways .…"

Further limitations on how gas tax revenues can be spent are imposed by article XIX, section 6 and Streets and Highways Code section 2107.4.  These sections set forth the maximum amount of the funds allocated to a city or county that can be used to make payments on voter-approved road improvement bonds.  Streets and Highways Code section 2107.4 provides, in part:

> "Not more than one-quarter of the funds allocated to a city or county from the Highway Users Tax Account … for the construction of streets therein may be used to make principal and interest payments on bonds issued for such construction, if the issuance of such bonds is authorized by a proposition approved by a majority of the votes cast thereon.…"

West Park acknowledges that the gas tax revenues may be indirectly applied to the uses set forth in article XIX, section 2.  (*City of Costa Mesa v. Connell* (1999) 74 Cal.App.4th 188, 193 (*Connell*).)  Nevertheless, West Park asserts that the installment payments are not being used for road improvements because they are being made to a shell corporation that is entirely uninvolved in any road improvement or other activity permitted by article XIX, section 2.  West Park notes that in *Connell, supra,* the court held that sublease payments on golf courses were impermissible because golf courses are not streets or highways and contends that the same rationale applies here.

However, in this case the Corporation is obligated to "cause the design, acquisition and construction" of the street improvements for, and sell those improvements to, the City.  To finance the projects, the Corporation is to sell certificates to third party investors that will be repaid over time by using, among other sources, the gas tax revenues.  Thus, the gas tax revenues are being used to pay for street improvements as

10.

required by article XIX, section 2.  No impermissible uses, such as golf course lease payments, are involved.

West Park further contends the City's use of gas tax revenues violates article XIX, section 6 and Streets and Highways Code section 2107.4 in that the City is using gas tax revenues on non-voter approved financing.  On this issue, West Park is correct.

In *Connell, supra,* the court was faced with a financing scheme similar to the one present here.  There, the city used a public finance authority, a joint powers authority of the city and its redevelopment agency, to raise funds for street widening.  As part of the financing, the finance authority issued non-voter approved bonds and the city made payments to the finance authority coinciding with the timing and amount of the finance authority's debt service payments due on the bonds.  The city's payments consisted, in part, of state gas tax revenues.  (*Connell, supra,* 74 Cal.App.4th at p. 191.)

The *Connell* court held that paying for non-voter approved street improvement bonds with gas tax revenues was impermissible.  The court concluded that article XIX, section 6, and Streets and Highways Code section 2107.4 were not limited to voter approved bonds as urged by the city.  Rather, the ability to use 25 percent of the gas tax revenues on street construction bonds " '*if* the issuance of such bonds is authorized by a proposition approved by a majority of the votes cast thereon' " "means no more than that a percentage of the funds may be used for bond financing of voter-approved bonds."  The court noted that any other interpretation would lead to absurd results.  (*Connell, supra,* 74 Cal.App.4th at pp. 195–196.)

The city in *Connell* further argued that it was irrelevant whether the bonds were voter approved because they were issued by the financing authority, which was not required to obtain voter approval to issue bonds.  The *Connell* court opined that this argument missed the point.  The court concluded the city was misusing gas tax revenue by making payments on non-voter approved bonds and the fact that the bond debt was the

11.

financing authority's, not the city's, was irrelevant. (*Connell, supra,* 74 Cal.App.4th at p. 196.)

Here, in arguing the financing does not violate article XIX, section 6 or Streets and Highways Code section 2107.4, the City relies on similar financing plans having been validated by at least eight California trial courts. The City requests this court to take judicial notice of these trial court orders. However, trial court orders hold no precedential value. (*Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761.) Accordingly, we will neither rely upon, nor take judicial notice of, these orders.

The City further asserts that the term "bonds" as used in article XIX, section 6 and Streets and Highways Code section 2107.4 means "bonds" and is distinct from making installment payments under an installment sale agreement. The City notes that the term is not defined in these sections and therefore must be given the meaning it bears in ordinary use. (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 480.)

The term "bond" has been defined as: " ' "[A]ny instrument in writing that legally binds a party to do a certain thing. 'Bond,' 'obligation,' and 'instrument in writing' are sometimes used in convertible terms," ' " " ' "[a]n instrument that implies an obligor bound to do what is agreed shall be done," ' " and " ' "[a]ny instrument in writing that legally binds a party to do a certain thing." ' " (*Karsh v. Fidelity Union Casualty Co.* (1932) 119 Cal.App. 543, 546.)

Under the certificate purchase agreement, the Corporation will agree to sell and deliver certificates representing a proportionate undivided interest in the installment sale payments made by the City to the Corporation. Payments will be made to the certificate holders from the specified funds. The certificates will be delivered to facilitate the financing of street improvements. The certificates will include a maturity date, principal amount, interest rate, price, and yield.

Thus, the certificates will be written instruments that will bind the Corporation to make payments to the certificate holder as set forth in the certificate. This fits the

12.

definition of a bond. The fact that the City and the Corporation call the instruments "certificates" rather than "bonds" is not determinative. The title of the instrument does not change its nature.

Accordingly, the City's gas tax revenues will be used to pay non-voter approved bonds. This is an impermissible use of these funds. (*Connell, supra,* 74 Cal.App.4th at p. 196.)

**4.      *The Corporation has a separate existence from the City.***

West Park contends there is a complete unity of identity between the City and the Corporation that renders the Corporation a shell entity and therefore it is the City that is issuing the certificates in violation of article XVI, section 18. According to West Park, the City will be entirely responsible for the Corporation's debt and the City exercises absolute control over the Corporation.

However, the Corporation was formed as a separate legal entity, a public benefit corporation. (Corp. Code, § 5110 et seq.) Corporations Code section 5111 provides that "a corporation may be formed under this part for any public or charitable purposes." As set forth in its articles of incorporation, the Corporation was formed to render assistance to the City in multiple ways such as financing, refinancing, acquiring, constructing, improving, remodeling, leasing and selling buildings; improving electrical, water, and sewer facilities; and entering into contracts for services or other purposes. Thus, contrary to West Park's characterization, the Corporation was not formed solely to issue the certificates. Rather, in the installment sale agreement with the City, the Corporation agrees to "cause the design, acquisition and construction" of the Projects.

Further, the California Secretary of State certified the articles of incorporation. This is conclusive evidence that the Corporation was formed and prima facie evidence of its corporate existence. (Corp. Code, § 5133.)

A financing plan similar to the one here was at issue in *Rider, supra.* In *Rider,* a financing agency was to issue bonds, use the bond proceeds to construct a capital

13.

improvement, and lease that improvement to a city. The California Supreme Court concluded that this financing plan was valid. (*Rider, supra,* 18 Cal.4th at p. 1039.) In answer to the appellants' argument that the financing agency was controlled by the city and therefore was a hollow shell, the court noted that it had never held that control by itself establishes the identity of two separate government entities. Rather, the court held that, because the financing agency had "a genuine separate existence" from the city, it did not matter whether or not the city "essentially" controlled the financing authority. (*Id.* at p. 1044.)

In so ruling, the court distinguished the earlier case of *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider I*). In *Rider I,* the court applied an "essential control" standard. However, this "essential control" standard was not used to establish "the identity of two separate governmental entities: 'Rather than attempting to demonstrate that the subject agency and county are *identical* entities, application of the "essential control" test simply affords ground for reasonably inferring an intent to circumvent Proposition 13.' " (*Rider, supra,* 18 Cal.4th at p. 1044; accord *San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416, 437–438.)

Therefore, if the Corporation has a "genuine separate existence" it does not matter what sort of control the City has over the Corporation. The trial court concluded the Corporation was a validly and legally formed public benefit corporation. This finding is supported by the record and thus will be upheld on appeal. Accordingly, the Corporation can lawfully issue the certificates.

West Park further asserts that the City is essentially responsible for the Corporation's debt and therefore voter approval was required under article XVI, section 18. However, the certificate purchase agreement states that the certificate is "payable solely from 2013 Installment Sale Payments." Further, the certificate itself provides "The obligations of the City to make the 2013 Installment Sale Payments are special obligations of the City payable solely from Gas Tax Revenues, Transportation Impact

14.

Fee Revenues and/or Restricted Utility Franchise and Surcharge Revenues (all as defined in the 2013 Installment Sale Agreement), and *do not constitute debts of the City or of the State of California or of any political subdivision thereof within the meaning of any constitutional or statutory debt limitation or restriction.*"  (Italics added.)  Thus, the City is not responsible for the Corporation's debt.

## DISPOSITION

The portion of the judgment validating the use of the state gas tax revenues to make payments on the certificates is reversed.  The remainder of the judgment is affirmed.  The parties shall bear their own costs on appeal.

_____

MCCABE, J. [†]

WE CONCUR:


_____

HILL, P.J.


_____

FRANSON, J.

---

[†]     Judge of the Merced Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.